**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK ANTHONY YOUNG,
        *Plaintiff-Appellant,*

v.

COUNTY OF LOS ANGELES and
RICHARD WELLS, Deputy,
        *Defendants-Appellees.*

No. 09-56372

D.C. No.
2:08-cv-05438-R-RZ

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 8, 2011—Pasadena, California

Filed August 26, 2011

Before: Stephen Reinhardt, Johnnie B. Rawlinson, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Reinhardt

16441

## COUNSEL

John C. Fattahi and Dale K. Galipo, Woodland Hills, California, and Paul Hoffman, Venice, California, for the plaintiff-appellant.

Raymond G. Fortner, Robert H. Granbo and Steven J. Renick, Los Angeles, California, for the defendants-appellees.

## OPINION

REINHARDT, Circuit Judge:

This case arises from a traffic stop for a seatbelt violation in which Los Angeles County Sheriff's Deputy Richard Wells pepper sprayed Mark Anthony Young and struck him with a baton after Young exited his vehicle and disobeyed Wells's order to reenter it. Young filed this action against Wells and the County of Los Angeles, claiming that Wells's use of force was excessive under the Fourth Amendment, and also that

Wells's conduct constituted false imprisonment and negligence under California tort law.[1] The district court granted summary judgment to the defendants on all of Young's claims. We affirm the grant of summary judgment on Young's false imprisonment claim. However, because we conclude that the use of intermediate force is unreasonable when an officer has detained a suspect for minor infractions and the suspect clearly poses no threat to the officer or the public safety, we reverse as to Young's excessive force and negligence claims.[2]

I.

Because on summary judgment the evidence of the non-moving party is assumed to be true, *see Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), we set forth the facts as alleged by Young, noting only those factual disagreements that are relevant to our decision here. At approximately 10:22 a.m. on a February morning in 2007, Young, a 46-year-old African-American probation officer, was driving his truck to the gym, wearing workout clothes and enjoying a snack of broccoli and tomato, when Deputy Wells pulled him over for driving with an unfastened seatbelt. An audio recording of the exchange that followed indicates that Wells informed Young of the basis for the traffic stop, and that Young conceded not

---

[1] Young's suit included another state law claim that is not at issue in this appeal.

[2] Defendants Wells and the County of Los Angeles submitted a joint brief that does not assert any separate defenses on behalf of the County. As the County has rested its defense of this appeal upon the simple premise that Young's claims against Wells are meritless, our disposition of this appeal addresses only the merits of those claims without regard to any separate defenses that the County might have raised in light of its status as a municipal defendant. Accordingly, our disposition of Young's claims against Wells apply equally to his claims against the County. For the sake of simplicity, we refer in the text to the positions taken in the defendants' brief as Wells's positions, when they are in actuality those of both Wells and the County, and our holdings apply to the County, as well as to Wells.

only that he had failed to fasten his seatbelt, but also that his car was missing both a side-mirror and a rear license plate. Young provided Wells with his driver's license and proof of insurance, but was unable to immediately find his vehicle registration. Wells told Young to continue searching for the registration and returned to his motorcycle to begin writing Young's citation.

When Young found his registration, he exited his truck carrying both the registration and his vegetables, walked to Wells's motorcycle, and handed Wells the registration. Wells took the registration and ordered Young to "just have a seat in the truck." Young declined to do so, stating, "I don't feel like sitting in my truck, man."[3] Instead, Young walked past his truck, sat on the sidewalk curb, and resumed eating his broccoli. The exchange between Wells and Young continued:

> DEPUTY WELLS: Mr. Young —
>
> MR. YOUNG: I don't feel —
>
> DEPUTY WELLS: — I'm not asking you what you feel like—
>
> MR. YOUNG: — sitting —
>
> DEPUTY WELLS: — doing.
>
> MR. YOUNG: — in my truck.
>
> DEPUTY WELLS: Have a seat in your truck, please.

---

[3]As is explained in Part III, *infra*, Wells's order that Young reenter his truck was a lawful one, and Young's refusal to obey was a violation of Cal. Penal Code § 148(a)(1) that gave Wells probable cause to arrest him. Whether the force he used was reasonable is a separate question. *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007).

    MR. YOUNG: I don't feel like sitting in my truck, officer.

    DEPUTY WELLS: Mr. Young, have a seat —

    MR. YOUNG: I don't feel like sitting in my truck.

    DEPUTY WELLS: — in your truck, please. Mr. Young, have a seat —

    MR. YOUNG: I don't feel like sitting in my —

    DEPUTY WELLS: — in your truck, please.

    MR. YOUNG: — truck.

    DEPUTY WELLS: Mr. Young, have a seat in your truck please. Until you sit in your truck, I can't write you the ticket. You want me to hurry up and write the ticket. Have a seat in your truck, please. Mr. Young. Mr. Young.

Young contends that shortly afterwards, while he was still sitting on the sidewalk curb, Wells approached him from behind[4] and pepper sprayed him. The audio transcript of the stop suggests Young was unaware he was about to be pepper sprayed:

    MR. YOUNG: You going to give me no — I'm an officer of the law, sir . . . You don't give me warning.

    DEPUTY WELLS: I don't have to give you a warning.

---

[4]Young's declaration states, "I felt liquid on my head, and turned my head around and saw Deputy Wells holding a can of pepper spray for the first time. I rose to my feet and tried to back away from the pepper spray. Deputy Wells continued to spray me."

Wells does not argue on this appeal that Young posed any physical threat to him prior to his use of pepper spray, nor that he reasonably or unreasonably feared such a threat.[5]

Wells continued to pepper spray Young as he rose to his feet and attempted to back away from the pepper spray. Young protested, repeatedly telling Wells, "I'm an officer of the law." Young asserts that Wells responded to his protests by drawing his baton, striking him a number of times with it, and ordering him to get on the ground.

Wells asserted in his motion for summary judgment that he struck Young with the baton because he "believed that [Young] was trying to gain a position of advantage over [him], from which position he could then launch an assault," and that he "believed that [Young] was about to throw the broccoli at [him] in order to cause a distraction before assaulting him." However, on this appeal, Wells makes no claim that his decision to strike Young with a baton was motivated by safety concerns.

Despite being struck, Young did not immediately get on the ground, and continued to object to Wells's use of force, saying, for example, "I'm not going to let you hit me another time," and "How you going to pepper spray me?" At this point, a second sheriff's deputy, Michael Berk, arrived on the scene, and, like Wells, ordered Young to lie on the ground. Young did so, and Berk handcuffed him and placed his knee on his back. Young contends that after he lay on the ground, Wells struck him with a baton again. As he lay handcuffed on his stomach with Officer Berk on his back, Young complained that Berk had handcuffed him too tightly, to which Berk responded, "Well, you know what, that's part of not

---

[5]Additionally, while Wells recorded in his incident report that Young had responded to his orders with the objection, "Fuck you, I don't want to, I'm eating my vegetables," the audio transcript records no such statement by Young.

going along with the program." Young continued to complain vocally about Wells's use of force, stating that his eyes were burning from the pepper spray, that he had not been warned prior to Wells's use of the spray, and that, "You cannot pepper spray nobody. You cannot just pepper spray nobody, officer." Berk replied to this last statement by saying, "If you keep getting agitated, I'm going to pepper spray you." Young asked to be allowed to stand up and to have his handcuffs loosened; Berk stated that "until you calm down, I ain't going to help you." After several minutes in which Young strenuously objected to his treatment — in particular, to the fact that Berk continued to press his knee into his back — the officers allowed Young to stand, and placed him in the back of Berk's police car.

Young filed suit against both Wells and the County of Los Angeles in the Central District of California, and the district court granted summary judgment for the defendants on all counts. We review that judgment *de novo*, "viewing the evidence in the light most favorable to the non-moving party to determine the presence of any issues of material fact." *Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010).

## II.

**[1]** Young appeals the district court's grant of summary judgment to Wells on his excessive force claim. Summary judgment is appropriate here only if, taking the facts in the light most favorable to Young, a reasonable jury could not find that "the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures using the framework articulated in *Graham v. Connor*, 490 U.S. 389 (1989). The reasonableness of a seizure turns on "whether . . . officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," *id.* at 397, which

we determine by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," *id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (internal quotation marks omitted). In conducting the balancing required by *Graham*, we first "assess the gravity of the particular intrusion on Fourth Amendment interests." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). Second, we "assess the importance of the government interests at stake." *Id.* Finally, we "balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id.*

**[2]** If we determine that, taking the facts in the light most favorable to Young, the defendant's conduct amounts to a violation of a constitutional right, we then determine whether the defendant is entitled to qualified immunity by assessing whether "the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (internal quotation marks omitted).

### 1.  *Nature and Quality of Intrusion*

**[3]** The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to "the type and amount of force inflicted." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). Young contends that Wells pepper sprayed him as he sat on the sidewalk eating his broccoli and continued to do so as he rose to his feet and attempted to back away from the pepper spray. Young further alleges that Wells attempted to strike him in the head with a baton, that he blocked "eight or more" such attempts with his arms before Wells landed a solid baton blow to his shin, and that Wells struck him again with the baton after he had lain down on the ground.[6]

---

[6]Wells argues that Young has failed to raise a genuine issue of material fact as to whether he was required to block "eight or more" baton swings

**[4]** Both pepper spray and baton blows are forms of force capable of inflicting significant pain and causing serious injury. As such, both are regarded as "intermediate force" that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests. *See Smith v. City of Hemet*, 394 F.3d 689, 701-02 (9th Cir. 2005); *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir. 2003).

Pepper spray "is *designed* to cause intense pain," and inflicts "a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," as well as "disorientation, anxiety, and panic." *Headwaters Forest Defense v. County of Humboldt,* 240 F. 3d 1185, 1199-1200 (9th Cir. 2000), *vacated and remanded on other grounds*, 534 U.S. 801 (2001)*; see also United States v. Neill*, 166 F.3d 943, 949-50 (9th Cir. 1999) (affirming district court finding that pepper spray is a "dangerous weapon" under the U.S. Sentencing Guidelines and describing trial evidence that pepper spray causes "extreme pain" and is "capable of causing 'protracted impairment of a function of a bodily organ' " as well as life-long health problems such as asthma). The evidence includes a declaration by a retired Los Angeles County Sheriff's Department lieutenant who testified as a police practices

---

aimed at his head because the audio recording of the incident captures Young exclaiming to passersby, "This man pepper sprayed me and hit me twice with a baton because I didn't have my seatbelt on." Because this brief audio snippet does not render Young's factual claim "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 380 (2007), the question of how many times Young was struck is an issue for the jury. Moreover, even if Wells struck Young only twice, Young's assertions would still be sufficient to raise a genuine issue of material fact, especially given that he alleges that one of the two baton blows that he did not block occurred while he was lying face-down on the ground. *See Blankenhorn,* 485 F.3d at 480 (holding genuine issue of material fact existed as to whether force used was excessive where officer punched suspect who was lying face-down on the ground).

expert and stated that the basic curriculum of the California Commission on Peace Officer Standards and Training[7] (POST) instructs officers that "the use of pepper spray can have very serious and debilitating consequences," and that "[a]s such, it should only be generally used as a defensive weapon and must never be used to intimidate a person or retaliate against an individual."

A police officer's use of baton blows, too, presents a significant use of force that is capable of causing pain and bodily injury, and therefore, baton blows, like pepper spray, are considered a form of "intermediate force." *Mohr*, 318 F.3d at 623. Young's evidence shows that California law enforcement officers are taught that a baton is a deadly weapon that can cause deep bruising as well as blood clots capable of precipitating deadly strokes, and that batons should therefore be used "only as a response to aggressive or combative acts." Furthermore, Los Angeles County Sheriff's Department policies instruct officers that "[h]ead strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force." *Cf. Thompson v. City of Chicago*, 472 F.3d 444, 451 & nn. 18-19 (7th Cir. 2006) (describing Chicago Police Department policies limiting the use of "impact weapons" such as batons to "high-level, high-risk assailants" who "pose[ ] a threat of serious bodily injury or death to officers and the public.").

**[5]** The amount of force used in this case was significant as well. Young alleges that Wells began pepper spraying him as he sat on the sidewalk curb and continued doing so as he stood up and backed away from him, suggesting that his exposure to pepper spray lasted for at least several seconds and involved more than just a minimal burst designed to star-

---

[7]The Commission sets minimum training standards for all California law enforcement personnel. *See* The Commission on Peace Officer Standards and Training, Commission on POST—Home, http://post.ca.gov/ (last visited August 19, 2011).

tle him and alert him to the seriousness of the situation and the potential for use of greater force. Similarly, Young alleges that in addition to landing two baton blows to his legs (including one while he was restrained on the ground), Wells swung the baton at Young's head multiple times.

**[6]** In pepper spraying Young and striking at him multiple times with a baton while landing at least two blows, Wells used a significant amount of two forms of intermediate force known to cause serious pain and to lead in some cases to serious physiological consequences. Whatever such force is ultimately labeled, there is no question that its use against an individual is a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest.

### 2. *Governmental Interest*

**[7]** In evaluating the government's interest in the use of force we look to: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller*, 340 F.3d at 964. However, our inquiry is not limited to these factors. Rather, recognizing that "the facts and circumstances of every excessive force case will vary widely," *Forrester v. City of San Diego*, 25 F.3d 804, 806 n.2 (9th Cir. 1994) (quotation marks omitted), our ultimate inquiry addresses "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure," *Garner*, 471 U.S. at 8-9.

**[8]** Of the three factors we traditionally examine in determining the governmental interest, the most important is whether the individual posed an immediate threat to officer or public safety. *Smith*, 394 F.3d at 702. Here, this factor decisively favors a finding that Wells used excessive force upon Young both in pepper spraying him and in striking him with a baton. Wells does not contend that Young posed any threat

whatsoever to an officer or to public safety prior to the use of the pepper spray. Nor could Wells plausibly allege any such safety threat: Young was sitting on the curb eating his broccoli with his back turned to Wells when Wells began to pepper spray him, and the record does not suggest that Young was threatening Wells or the public in any way. *See Bryan v. McPherson*, 630 F.3d 805, 832-33 (9th Cir. 2010) (concluding suspect posed no immediate threat to officer where "[t]he facts suggest that [the suspect] was not even facing [the officer] when he was shot [with a taser]."). The record is thus clear and the parties do not dispute that no reasonable safety concern warranted Wells's use of pepper spray upon Young.

**[9]** With respect to Wells's use of baton blows after Young stood up from the curb, Wells again does not argue on appeal that his use of force was motivated by any concern for his safety. However, on summary judgment he submitted as an exhibit a contemporaneous incident report in which he stated that his baton blows were motivated by safety concerns, stating that "the manner in which Young was moving and circling me caused me to believe that he was trying to gain a position of advantage over me" and that he feared Young "was going to throw the broccoli at me as a distraction before assaulting me." Even if Wells had advanced this argument on appeal, it would for two reasons be inadequate to support a grant of summary judgment with respect to Young's claim that Wells's use of the baton constituted excessive force. First, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle,* 272 F.3d at 1281; *see also Graham*, 490 U.S.at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . ."). Here, whether objective factors supported Wells's supposed subjective fear is not a question that can be answered as a matter of law based upon the limited evidence in the record, especially given that on summary judgment that evidence must be construed in the light most favorable to Young, the non-moving party. *See*

*Benay*, 607 F.3d at 624. Rather, whether Wells's claim that he feared a broccoli-based assault is credible and reasonable presents a genuine question of material fact that must be resolved not by a court ruling on a motion for summary judgment but by a jury in its capacity as the trier of fact. *See Deorle,* 272 F.3d. at 1281.

Second, whether a startled Young rose to his feet, "moving and circling" Wells also presents a genuine issue of fact. Moreover, it would hardly be surprising if Young did so given that he had just been unexpectedly pepper sprayed while sitting on the curb eating his broccoli. This court has recognized that an officer's "provocative conduct" can trigger an individual's "limited right to offer reasonable resistance." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001). We have held that police conduct similar to Wells's qualifies as sufficiently provocative to trigger this limited right of resistance, and a jury could easily conclude that Young's alleged conduct of "moving" and "circling" — far from indicating any objective safety threat to Wells — was simply a reasonable response from an individual who was pepper sprayed from behind without warning while sitting on the sidewalk. *See Blankenhorn*, 485 F.3d at 479-80 (holding limited right to resistance applied where "arresting officers gave no warning that they were going to arrest [a suspect who refused an officer's order to kneel down to be handcuffed] before gang-tackling him and later applying hobble restraints"; observing that "[t]he lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon Blankenhorn could reasonably be considered 'provocative,' triggering Blankenhorn's limited right to reasonable resistance and thus making their later use of the hobble restraints unreasonable").

Moreover, Young asserts that one of Wells's baton blows against him took place as Young lay face-first on the ground. Were a jury to deem this assertion credible it could readily conclude that the force used was far in excess of any safety

concerns, reasonable or otherwise, that might have motivated Wells's alleged conduct.

In short, no safety concern whatsoever appear to have justified Wells's decision to approach a sitting Young from behind and pepper spray him, and Wells's declaration that his baton strikes were justified by a reasonable fear for his safety—an argument that he has not advanced in defending this appeal—would, at most, suffice to raise a jury question as to whether his use of force was justified by an immediate threat to his safety. Thus, the single most important factor in assessing the government's interest in the use of force weighs heavily against the district court's grant of summary judgment to Wells.

**[10]** In addition to immediate safety threats, in determining whether there is a sufficiently strong governmental interest to justify a given use of force we must consider "the severity of the crime at issue." *Miller*, 340 F.3d at 964. Young committed two offenses prior to Wells's use of force. First, he drove his truck without fastening his seatbelt, the offense that led Wells to initiate the traffic stop. Second, after exiting his truck to provide Wells with his registration, Young refused Wells's instructions to re-enter the truck, insisting on sitting on the curb and eating his broccoli instead, thus committing the misdemeanor offense of interfering with a peace office in violation of Cal. Pen. Code § 148(a)(1); *see also* Cal. Pen. Code § 17(b) (defining misdemeanor offenses under California law). Young's failure to wear a seatbelt was a run-of-the-mill traffic violation that clearly provided little, if any, support for the use of force upon him. *See Bryan*, 630 F.3d at 828 ("Traffic violations generally will not support the use of a significant level of force.") (citing *Delville v. Mercantel*, 567 F.3d 156, 167 (5th Cir. 2009)). And while disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious

offenses, such as violent felonies.[8] *See, e.g.*, *Bryan*, 630 F.3d at 828-29 ("While the commission of a misdemeanor offense is not to be taken likely, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others.") (quoting *Headwaters I*, 240 F. 3d at 1204) (internal quotation marks omitted). When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force. Because neither of Young's suspected offenses indicated that he posed a danger to Wells or the public such that there would be a heightened interest in the use of force to subdue him, the "severity of the crime at issue" weighs against a finding that the government had an interest in the use of significant force.

[11] Finally, in assessing the governmental interest in force we consider whether the suspect "was actively resisting arrest or attempting to evade arrest by flight." *Miller*, 340 F.3d at 964. This factor, too, weighs against a finding that the government had a significant interest in the use of force in this case. Young was not being placed under arrest nor attempting to

---

[8]Although we note that both of the offenses of which Young was suspected were misdemeanors, a crime's status as a misdemeanor or felony is not the key question but rather provides a rough proxy for the true object of the court's inquiry: whether a given offense indicates a suspect's potential dangerousness, immediate or otherwise, such that there is a heightened social interest in the use of force to apprehend or subdue that suspect. *See Garner*, 471 U.S at 14 ("And while in earlier times the gulf between the felonies and the minor offences was broad and deep, today the distinction is minor and often arbitrary. . . . Indeed, numerous misdemeanors involve conduct more dangerous than many felonies.") (internal citations and quotation marks omitted). While the fact that Young was suspected only of misdemeanor offenses weighs against a finding that the use of significant force against him was justified, it is ultimately the nonviolent and relatively minor nature of his suspected offenses that is of more importance.

flee when Wells began to pepper spray him; in fact, Wells pepper sprayed him before even providing him with a warning that he could be arrested for his noncompliance with Wells's order that he reenter his truck. Nor, according to Young, did Wells make any statements or take any action that could have been construed as an attempt to initiate an arrest prior to striking him with his baton.

[12] In addition to the three factors that we traditionally consider in evaluating the governmental interest in a given use of force, all of which weigh in favor of a determination that the government had a minimal interest in the use of significant force, Wells urges that after Young refused the order to reenter his truck, his "only options were to abandon his attempt to get [Young] to comply with his lawful order or to resort to force." The record in this case would not compel a reasonable jury to accept Wells's position that if he had not used force at the moment he did, he would have had no alternative but to acquiesce in Young's disobedience of his order. Wells had a variety of less intrusive options at his disposal when Young refused his orders: Wells could have warned Young that he would be placed under arrest if he did not comply with the order; he could have warned Young that disobedience would lead Wells to use force against him; he could have simply begun to effect Young's arrest by attempting to handcuff him; or he could have called for assistance as he apparently did in order to summon Berk to the scene. Wells chose none of these options, thus bypassing a variety of less painful and potentially injurious measures that would have been both feasible and reasonable under the circumstances. Instead, he proceeded to employ a level of intermediate force that caused Young significant pain and threatened serious bodily injury. That he did so given the availability of other, less intrusive measures makes clear just how limited was the government's interest in the use of significant force. *See, e.g.*, *Bryan*, 630 F.3d at 831 ("[W]hile by no means dispositive, that Officer MacPherson did not provide a warning before deploying the [taser] and apparently did not consider less

intrusive means of effecting Bryan's arrest factor significantly into our *Graham* analysis."); *Blankenhorn*, 485 F.3d at 478 (holding jury question existed as to whether officers used excessive force in gang-tackling a suspect where officer asked suspect to kneel down to be handcuffed, suspect refused, and officers "did not try to handcuff Blankenhorn before the three officers tackled him"); *Deorle*, 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.").

3. *Balancing Governmental Interest Against Nature of Intrusion*

We conclude our analysis of whether the force used by Wells was reasonable by balancing "the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller*, 340 F.3d at 964. The intermediate force used by Wells indisputably constituted a significant intrusion upon Young's liberty interests. In assessing the countervailing governmental interest that we must balance against that intrusion, as explained above, all three factors traditionally used to assess the government's interest weigh against a finding that the force used in this case was reasonable. First, the "immediate threat to safety of the officer or others," *Miller*, 340 F.3d at 964, was negligible: Wells has never argued that Young posed any sort of safety threat prior to his use of pepper spray, and to the extent that he argued in the district court that his baton blows were justified by fears for his safety, such arguments would, at most, suffice to raise a jury question as to whether it was reasonable for him to fear an assault from a man who had failed to wear his seatbelt and was armed only with broccoli and a tomato — a man who had not in any way threatened him or indicated any propensity for violent behavior. Second, the crimes involved in Young's traffic stop were non-violent misdemeanors committed in a manner that gave no indication of dangerousness to Wells or others, and thus

not sufficiently "severe" to justify the use of significant force. Finally, Young was not actively resisting arrest or attempting to flee. As well, while not included among the factors we traditionally consider, the fact that Wells could have feasibly employed less intrusive measures prior to his use of force suggests that the government's interest in the use of significant force was extremely limited, if not altogether non-existent.

**[13]** Having determined that the force allegedly used against Young was significant and that the governmental interest in the use of that force minimal, we conclude that, taking the facts in the light most favorable to Young, the force used by Wells was excessive in violation of the Fourth Amendment.

Our conclusion comports with the logical notion that it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety. Indeed, we have found the use of pepper spray to be excessive in such circumstances even when a warning was provided. *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1129-30 (9th Cir. 2002) (*Headwaters II*). In *Headwaters II*, police officers used pepper spray upon non-violent environmental protesters who entered a lumber company's headquarters, linked themselves together using "self-releasing lock-down devices" known as "black bears," and refused to disengage even after police officers ordered them to do so and warned them that they would be pepper sprayed if they did not comply. *Id.* at 1127-28. Emphasizing that "pepper spray was unnecessary to subdue, remove, or arrest the protesters," *id.* at 1130, and that the officers had non-violent means of extricating the protesters from the black bears, *id.*, we held that, "the use of pepper spray on the protestors' eyes and faces was plainly in excess of the force necessary under the circumstances, and no reasonable officer could have concluded otherwise." *Id.* at 1131. So, too,

here, Wells's purported use of pepper spray and baton blows in response to Young's failure to obey an order would be "plainly in excess of the force necessary under the circumstances," *id.*, and thus excessive under the Fourth Amendment.

### 4. *Qualified Immunity*

**[14]** Having determined that, "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right," *Saucier,* 533 U.S. at 201, we must ask whether, "the right at issue was 'clearly established' at the time of defendant's alleged misconduct," *Pearson*, 129 S. Ct. at 816, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202. The Supreme Court has explained that, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," and has rejected, "a requirement that previous cases be 'fundamentally similar' " to the facts at issue in a suit. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, the relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the defendants "fair warning" that their conduct was unconstitutional — that a fair application of well-established legal principles would warrant such a conclusion. *Id.*

**[15]** The legal principles that dictate our conclusion that the force involved was excessive were clearly established and indeed, long-standing, prior to 2007, the time of the use of force at issue in this case. *Graham*'s holding that the Fourth Amendment allows only such force as is objectively reasonable under the circumstances was well-established long before that time, *see Graham*, 490 U.S. at 396-97, as was the fact that objective reasonableness is determined through "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," *id.* at 396. Similarly

well-established were the criteria by which the government's interest in a given use of force is determined. *See Miller*, 340 F.3d at 964.

**[16]** Relying upon that established law, we held in *Blankenhorn* that police officers violated Fourth Amendment principles that were clearly established by 2001, the time at which they gang-tackled an individual who was suspected of trespassing and disobeyed an officer's order to kneel down and be handcuffed. 485 F.3d at 468, 479. We noted that "the severity of the alleged crime, misdemeanor trespass, was minimal," *id.* at 478, that a jury could conclude the suspect "did not pose a serious threat to the officers' or others' safety," *id.*, and that, notwithstanding the suspect's refusal to kneel down, a jury could conclude he was not actively resisting arrest, *id.* at 479. On the basis of those observations we held that a rational jury "could conclude the gang tackle was unreasonable under the circumstances," *id.* at 478, and thus violated the suspect's Fourth Amendment rights. What is more, we held that the officers in *Blankenhorn* were not entitled to qualified immunity because *Graham*'s reasonableness standard provided them with notice that their conduct was unconstitutional. We explained that,

> [i]n assessing the state of the law at the time of Blankenhorn's [2001] arrest, we need look no further than *Graham*'s holding that force is only justified when there is a need for force. We conclude that this clear principle would have put a prudent officer on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect — especially one who had been cooperative in the past and was at the moment not actively resisting arrest — was a violation of that person's Fourth Amendment rights.

485 F.3d at 481. The principle that it is unreasonable to use significant force against a suspect who was suspected of a

minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest, was thus well-established in 2001, years before the events at issue in this case. Just as in *Blankenhorn*, these well-established principles of Fourth Amendment law sufficed to put Wells on notice that the force used was excessive — that to pepper spray an individual and strike him with a baton for disobeying a traffic officer's order to get back in his car (and sitting instead on the curb eating his broccoli) constituted a violation of the Fourth Amendment.

In addition to *Blankenhorn*'s holding as to the notice provided to reasonable officers by 2001, our holding in *Headwaters II* would have provided a reasonable officer in Wells's position with specific and unambiguous notice that the use of pepper spray and baton blows constituted excessive force. In *Headwaters II*, we held that police officers employ excessive force in violation of the Fourth Amendment when they use pepper spray upon an individual who is engaged in the commission of a non-violent misdemeanor and who is disobeying a police officer's order but otherwise poses no threat to the officer or others. 276 F.3d. at 1131. While the facts in *Headwaters II* are in some respects distinct from those of this case, that case's straightforward holding would have provided explicit and unambiguous notice to any reasonable officer in Wells's position that the use of intermediate force in general, and of pepper spray in particular, would, under the circumstances as alleged in this case, constitute an excessive response to a suspect's commission of a misdemeanor and disobedience of a police order. *See Hope*, 536 U.S. at 741 (holding that factually identical precedents are not required for law to be clearly established for qualified immunity purposes).

**[17]** Because the legal rules dictating the result reached in this case were well-established at the time of Wells's conduct,

we conclude that the district court erred in granting summary judgment on the issue of qualified immunity.[9]

### III.

**[18]** Young also appeals the district court's grant of summary judgment to Wells as to his false imprisonment claim. Under California law, the elements of a claim for false imprisonment are: "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *See Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (Cal. App. 2000). The only element at issue in this appeal is whether Wells had lawful privilege to arrest Young. Young contends that Wells lacked "lawful privilege" to arrest him for two reasons. We address each in turn.

**[19]** Young first argues that he did not violate § 148(a)(1) because Wells's order that he reenter his vehicle was an unlawful attempted seizure in violation of the Fourth Amendment, and § 148(a)(1) prohibits only refusal to comply with a peace officer's *lawful* orders. *See Smith*, 394 F.3d at 695. In *United States v. Williams*, 419 F.3d 1029 (9th Cir. 2005), we held that the Fourth Amendment allows an officer to order a passenger who has exited an automobile during a traffic stop to reenter the vehicle. *Id.* at 1030-31. Young argues that *Wil-*

---

[9]Our conclusion that Wells is not entitled to summary judgment on his qualified immunity claim is further supported by the evidence presented by Young that the minimum training standards for California law enforcement personnel instruct that both pepper spray and batons are painful, potentially dangerous weapons that should be used only as defensive weapons in response to a suspect's aggressive actions. While our holding that Wells is not entitled to qualified immunity in this case ultimately rests not on such training standards, but on clearly established constitutional law principles and holdings, the fact that Wells's alleged conduct violated basic police practice makes clear that a reasonable officer in Wells's position would have had abundant notice that the conduct at issue was unlawful.

*liams* does not govern this case because Young was not the vehicle's passenger, but rather its driver. However, the reasoning upon which our conclusion in *Williams* was based applies with no less force when it is the driver who is ordered to reenter a vehicle. Like an order to a passenger, an order that a driver reenter a vehicle during a traffic stop intrudes only minimally upon the individual's liberty interests, "because only the [driver's] location during the stop is affected*." Id.* at 1033 (citing *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).[10] Balanced against that limited intrusion is the important "value of giving officers control over the movement of people involved in a traffic stop [in order to] limit[ ] the risk of danger to the police." *Id.* at 1034.[11] We therefore hold that, consistent with this court's reasoning in *Williams*, a police officer issuing a traffic citation does not violate the Fourth Amendment by ordering a driver to reenter his vehicle for the duration of a traffic stop. Based upon this holding, we conclude

---

[10]Indeed, *Williams* noted that drivers have even more limited liberty interests during a traffic stop than do passengers, because, "there is probable cause to stop the driver based on the traffic infraction." *Id.* at 1032.

[11]*Williams* emphasized that "[a]llowing a passenger . . . to wander freely about while a lone officer conducts a traffic stop presents a dangerous situation by splitting the officer's attention between two or more individuals." *Id.* at 1034. Young argues that this rationale is inapplicable here, as Wells needed to account for only one individual during the course of the traffic stop. However, our holding in *Williams* did not rest on the fact that the stopped car contained more than one individual. Rather, it rested on the need to allow an officer to safely perform his duties during the stop without being distracted by the need to ensure that an individual who has wandered from a vehicle poses no threat to the officer or the public safety. *See id.* (emphasizing "the value of giving officers control over the movement of people involved in a traffic stop as helpful in limiting the risk of danger to the police and the occupants of the car."). Here, although Young was the only individual for whom Wells needed to account, the task of accounting for Young's movements and actions threatened to distract Wells from the performance of his duties, specifically the completion of Young's traffic citation. We see no reason to deem *Williams* inapplicable simply because Wells's attention was divided between Young's movements and the completion of a citation, rather than between the movements of two individuals.

that Wells's order that Young reenter his vehicle was a lawful one that, under § 148(a)(1), Young was required to obey.

**[20]** Young's second argument as to why Wells lacked probable cause to arrest him is that Young's repeated statements to Deputy Wells that he would not re-enter his vehicle were acts of expression protected by the First Amendment. Young relies upon *People v. Quiroga*, 16 Cal. App. 4th 961 (Cal. App. 1993), which held that an individual who protested repeatedly before complying with an officer's orders could not be prosecuted under § 148(a)(1) because verbal challenges to police action are protected by the First Amendment. *Id.* at 966. However, Young's case is distinct from *Quiroga* because although the defendant in *Quiroga* did not "respond with alacrity" to an officer's orders, *id.*, he did ultimately respond to them. *Id.* at 964 ("Appellant argued before *complying with the order*.") (emphasis added). Young was not arrested for protesting prior to complying with Deputy Wells's order to reenter his truck, but for failing altogether to comply with the order. While Young did verbally protest Wells's order, his failure to reenter his truck was not an act of expression protected by the First Amendment, but rather a simple failure to obey a police officer's lawful instructions.

**[21]** Because Wells's order that Young reenter his vehicle was lawful and Young's refusal to obey was not an act of speech protected by the First Amendment, Wells had the authority to arrest Young for disobeying a peace officer's order in violation of § 148(a)(1). Young has thus failed to establish an essential element of a false imprisonment claim under California law — that he was arrested "without lawful privilege." *Easton*, 80 Cal. App. 4th at 496. Accordingly, we affirm the district court's grant of summary judgment to Wells with respect to Young's false imprisonment claim.

## IV.

**[22]** In conclusion, we affirm the district court's grant of summary judgment to Wells with respect to Young's false

imprisonment claim because Wells had lawful authority to arrest Young on account of his violation of Cal. Penal Code § 148(a)(1). However, we reverse with respect to Young's claim alleging excessive force in violation of the Fourth Amendment. He asserts facts that amount to a textbook violation of his Fourth Amendment rights: the use of significant force without warning against an individual who committed only minor misdemeanors; who posed no apparent threat to officer or public safety; and who was not seeking to flee, even though a variety of less intrusive alternatives to the use of such force was available. The district court thus erred in granting summary judgment to Wells both with respect to whether a constitutional violation had occurred, and with respect to whether the law governing Wells's conduct was clearly established. Because the Fourth Amendment violation alleged by Young also suffices to establish the breach of a duty of care under California law, we reverse the district court's dismissal of Young's state law negligence claim, as well. *See, e.g.*, *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1108-09 (Cal. App. 2004) (applying Fourth Amendment reasonableness standard to claim that officer was negligent in using excessive force).

**AFFIRMED**, in part, **REVERSED**, in part, and **REMANDED.**