Chief Judge KOZINSKI,
joined by
Judge BEA, concurring in part and dissenting in part:
By asking police to serve and protect us, we citizens agree to comply with their instructions and cooperate with their investigations. Unfortunately, not all of us hold up our end of the bargain. As a result, officers face an ever-present risk that routine police work will suddenly become dangerous. In the last decade, more than half a million police were assaulted in the line of duty. More than 160,000 were injured, and 536 were killed — the vast majority while performing routine law enforcement tasks like conducting traffic stops and responding to domestic disturbance calls. Criminal Justice Info. Servs. Div., Fed. Bureau of Investigation, Law Enforcement Officers Killed & Assaulted, *454 2009 (Oct.2010), http://www2.fbi.gov/ucr/ killed/2009/aboutleoka.html (tables 19 and 70).
Brooks and Mattos breached the covenant of cooperation by refusing to comply with police orders. When citizens do that, police must bring the situation under control, and they have a number of tools at their disposal. Traditional tools, such as choke holds, arm locks and other hand-to-hand techniques, can cause permanent injury, even death. The standard issue baton “is a deadly weapon that can cause deep bruising as well as blood clots capable of precipitating deadly strokes.” Young v. Cnty. of Los Angeles, 655 F.3d 1156, 1162 (9th Cir.2011); see also id. at 1161-62 (pepper spray is no fun either). These methods are also distasteful to officers, who can deploy such close-range tactics only by stepping in harm’s way.
The Taser is a safe alternative: It’s effective at a range of fifteen to thirty-five feet, so officers can use it without engaging in personal combat. And a study by six university departments of emergency medicine found that 99.7 percent of those Tased by police suffer no injuries or, at most, mild ones. William P. Bozeman et al., Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Against Criminal Suspects, 53 Annals Emergency Med. 480, 484 (2009). The research division of the Department of Justice concluded that Taser deployment “has a margin of safety as great or greater than most alternatives,” and carries a “significantly lower risk of injury than physical force.” John H. Laub, Director, Nat’l Inst, of Justice, Study of Deaths Following Electro Muscular Disruption 30-31 (2011).
Cases in point: Malaika Brooks and Jayzel Mattos. Brooks actively resisted arrest; Mattos refused to get out of the way when police tried to arrest her large, drunk, angry husband. In each case, the arresting officers deployed a Taser and were able to defuse the situation without anyone getting seriously hurt. We can’t be sure the results would have been as good had the police used other methods.
The Fourth Amendment proscribes only unreasonable searches and seizures. Police need not use the least necessary force, see Luchtel v. Hagemann, 623 F.3d 975, 982 (9th Cir.2010), but the officers here did just that. Nevertheless, the majority finds their actions unconstitutional, and thereby deters officers from employing a safe, effective technique for subduing uncooperative subjects. This will cause police to resort to more dangerous methods in the future. Count me out.

Brooks v. City of Seattle

Pulled over for speeding in a school zone, Brooks found herself in a situation familiar to motorists. Every year, millions of people get traffic tickets. No one likes it, but we set our resentment aside, sign our citations and move on. Not Brooks. Officer Ornelas gave her a ticket in the normal course, but Brooks denied speeding and refused to sign. Ornelas assured Brooks that she wouldn’t admit guilt by signing, but she still refused. When Officer Jones stopped to assist, he told Brooks she was required by law to sign and reiterated that she wouldn’t admit guilt by doing so. Jones pointed to the writing at the bottom of the ticket, which read: “Without admitting to having committed each of the above offenses, by signing this document I acknowledge receipt of this notice of infraction and promise to respond as directed on this notice.” Brooks called Jones a liar and again denied speeding. Jones showed her the reading on the radar gun, but Brooks claimed it had clocked the car in front of her. She remained defiant even after Jones told her she’d be arrested if she continued to refuse.
*455 In an attempt to resolve the situation short of an arrest, Jones called Sergeant Daman, who arrived five minutes later, approached Brooks and introduced himself as the other officers’ supervisor. By then, Brooks was “irrational, screaming and out of control,” but Daman gave her another chance to sign the ticket instead of going to jail.
When Brooks still refused, Daman ordered Ornelas and Jones to arrest her. Ornelas told Brooks to get out of her car, but she refused. In further effort to avoid using force, Jones told Brooks he’d Tase her if she wouldn’t leave the car. He removed the darts from his Taser, told Brooks the device would cause pain if he were required to use it, and cycled it so she could see and hear its electric current. Brooks didn’t get out, so the officers tried to extract her, but she “wrapped her arm around the steering column ... and wedged her body into the driver’s seat.”
What were the officers supposed to do at that point? Brooks had shown herself deaf to reason, and moderate physical force had only led to further entrenchment. The officers couldn’t just walk away — Brooks was under arrest. Moreover, Brooks was behaving erratically, and her keys were in the car. The officers had to physically control her somehow, lest she manage to start up the engine and run someone over. How long was this stalemate supposed to go on? Brooks was tying up two line officers, a sergeant and three police vehicles — resources diverted from other community functions — to deal with one lousy traffic ticket.
The majority casts aspersions on what the officers did here, condemning their decision to Tase Brooks as unconstitutional. But, even with the benefit of hindsight and plenty of time to think about it, my colleagues offer no alternative course of action. They ignore the significant fact that, at the time Brooks was Tased, she was no longer a random motorist getting a traffic ticket; she was under arrest. As the Supreme Court has recognized, making an arrest “necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). When police effect an arrest, their relationship with the citizen changes in a material way: The citizen is now subject to the officers’ control and has a lawful duty to submit to their authority; failure to do so is a crime. By her own willful conduct, Brooks delivered herself to the power of the officers and the force necessary for them to complete the arrest.
Nor do my colleagues explain why Brooks’s pregnancy renders the officers’ actions any less reasonable. Should the officers have slammed Brooks’s fingers with a baton to make her let go of the steering column? Forcibly ripped her from the driver’s seat, smashing her abdomen against the steering wheel? Doused her with pepper spray or some other noxious chemical, which would be absorbed into her bloodstream and go straight to the fetus? Those options all involved serious risk of harm to both Brooks and her unborn daughter. Had the officers tried them, we’d still be here, only Brooks would have a stronger case.
Having already warned Brooks that he’d Tase her if she wouldn’t comply, Jones tried the lightest possible application of the device, pressing it against her clothed thigh for five seconds. Brooks continued to resist, so Jones applied the Taser to the exposed skin of her arm and neck. The Tasing stopped as soon as Brooks was out of the car, but Brooks was obstinate to the bitter end, “resist[ing] being handcuffed by keeping her arms tense.” The officers nevertheless defused the situation without *456 causing serious harm: Brooks suffered only minor scars, her daughter was born healthy and Brooks’s counsel confirmed at oral argument that the child remains healthy.
Faced with these utterly positive results, despite Brooks’s stubborn effort to put herself and her unborn daughter in harm’s way, the majority is reduced to counting the seconds between Tasings, finding that the “rapid succession provided no time for Brooks to recover ... and reconsider her refusal to comply.” Majority op. at 445. Bull pucky! Although Brooks claims she was “scared” and “in shock” after the initial Tasing, she also admits that she began yelling for help and honking her car’s horn. Stepping into the shoes of a reasonable officer at the scene, as we must, see Graham, 490 U.S. at 396-97, 109 S.Ct. 1865; Luchtel, 623 F.3d at 980, Brooks’s actions weren’t those of someone dazed and befuddled, unable to think about what to do next. They bespoke a deliberate decision to continue her defiance. A single drive-stun application having already proved insufficient inducement to Brooks’s compliance, the double dose was an objectively reasonable next step and was therefore entirely constitutional. See Scott v. Harris, 550 U.S. 372, 381-82 & n. 8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
According to the majority, “Brooks bears some responsibility for the escalation of this incident.” Majority op. at 445 (emphasis added). This suggests that the rest of the blame is with the officers. Wrong, wrong, wrong. Brooks is completely, wholly, 100 percent at fault. Had she behaved responsibly, she’d have driven away in a few minutes with no complications. Instead, Brooks risked harm to herself, her unborn daughter and three police officers because she got her dander up over a traffic ticket. The officers, for their part, were endlessly patient, despite being called liars and otherwise abused by Brooks. They deserve our praise, not the opprobrium of being declared constitutional violators. The City of Seattle should award them commendations for grace under fire.
I agree, of course, with the majority that the officers are entitled to qualified immunity from Brooks’s excessive force claim. But, because I believe the officers’ actions were entirely reasonable, I dissent from my colleagues’ decision to deny them immunity from Brooks’s state law assault and battery claims. See McKinney v. City of Tukwila, 103 Wash.App. 391, 13 P.3d 631, 641 (2000) (“Having found ... that the officers’ use of force was reasonable, we find that they are entitled to state law qualified immunity for the assault and battery claims.”).

Mattos v. Agarano

I find Mattos considerably closer but, for the reasons stated in the panel opinion, Mattos v. Agarano, 590 F.3d 1082 (9th Cir.2010), I believe the officers in that case acted constitutionally as well. They entered the Mattoses’ home in response to a domestic violence call initiated by Jayzel herself. By the time the officers arrived, Jayzel seems to have regretted getting the police involved. However, police are trained not to leave just because the parties to a domestic dispute ask them to do so. They have to assess the situation and make sure everyone is, in fact, OK. This usually involves talking to both parties separately, determining whether the party who called is under duress and entering the home to check on the safety of children or others inside. This is a highly intrusive procedure but one made necessary by our litigation-minded culture.
It’s a difficult situation all around, and the best way to get through it is for everyone to cooperate with the police. Unfortu *457 nately, Jayzel’s husband was combative with the officers, and Jayzel came to his defense instead of letting the police do their work. When Officer Aikala placed Troy under arrest, Jayzel stood in Aikala’s way, asking questions and insisting that everyone go outside. It’s simple common sense, as well as a civic duty, to stand aside immediately when police announce they’re making an arrest. Jayzel neither exhibited common sense nor fulfilled her civic duty; she breached the covenant of cooperation by interfering with the officers’ efforts to do their job.
When Aikala moved in to handcuff Troy, Jayzel did not get out of the way and allow the officer to complete the arrest. Instead, she stood her ground, eventually raising her hands and touching Aikala’s chest. Aikala stepped back and asked if Jayzel was touching an officer, but she didn’t answer him. Instead, she turned to Officer Agarano and again urged him to move the confrontation outside. That’s when Aikala Tased her, and his fellow officers handcuffed Troy.
In hindsight, Aikala might have given Jayzel a bit more warning, but when evaluating the reasonableness of an officer’s use of force, we “‘allow[] for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving.’ ” Luchtel, 623 F.3d at 982 (quoting Graham, 490 U.S. at 397, 109 S.Ct. 1865). When, as here, police enter somebody’s house in response to a domestic violence call, they become targets of fear and anger generated during the initial dispute. They’re in close quarters, “at the disadvantage of being on [their] adversary’s ‘turf.’ ” Maryland v. Buie, 494 U.S. 325, 333, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Officers must maintain a defensive posture throughout their investigation, operating under the assumption that “violence may be lurking and explode with little warning.” United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir.2005) (internal quotation marks omitted). “[M]ore officers are killed or injured on domestic violence calls than on any other type of call.” Id. (internal quotation marks omitted). Accounting for that enhanced risk, the officers’ actions here were objectively reasonable.
Judge Schroeder seems to be of the view that police may use Tasers, and presumably other types of force, only against subjects who present a threat of violence. Concurrence at 452-53. That has never been the law. A citizen has no right to refuse to follow reasonable police orders, to tie up police resources endlessly or to interfere with an arrest by standing in the way and insisting that the police leave the scene of the crime. The Supreme Court told us that “the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.” Graham, 490 U.S. at 396,109 S.Ct. 1865. Judge Schroeder’s theory conflicts with this instruction, and also with Forrester v. City of San Diego, 25 F.3d 804, 806 (9th Cir.1994), where we upheld a jury’s finding that police didn’t use excessive force when they “forcibly moved [passive protesters] by tightening [nonchakus] around their wrists,” causing serious pain and lasting injuries. Judge Schroeder would also have us split with the Tenth Circuit’s decision in Mecham v. Frazier, 500 F.3d 1200 (10th Cir.2007). There, an officer told a woman to leave her car or he’d arrest her, but she refused. Id. at 1203. Displaying far less patience than the officers here, the policeman in Meeham simply pepper-sprayed her and pulled her from the car. Id. The Tenth Circuit held that this was objectively reasonable. Id. at 1205.
*458 I’m also surprised by Judge Schroeder’s chauvinistic suggestion that Brooks and Mattos were entitled to special treatment because “[b]oth were women, with children nearby.” Concurrence at 452. I thought we were long past the point where special pleading on the basis of sex was an acceptable form of argument. Women can, of course, be just as uncooperative and dangerous as men, and I would be most reluctant to adopt a constitutional rule that police must treat people differently because of them sex. As for the children being nearby, that’s an appeal to the heartstrings that misses the mark in both cases. Brooks’s son had left the car and trundled off to school; his proximity had nothing at all to do with Brooks’s bizarre behavior. And there is nothing in the record suggesting that Mattos’s children were in harm’s way; I don’t see how their presence in the house has any bearing on the case.
In any event, I disagree with Judge Schroeder’s premise that these were nonthreatening situations. In the Mattoses’ case, the danger was quite obvious: It came from Troy — Jayzel’s out-of-control, drunken husband. He needed to be subdued at once, before he could lunge at the officers, grab a weapon or run away. By interfering, Jayzel wasted precious time— time Troy could use to attack the officers or Jayzel herself.
Brooks was sitting inside a ton of steel, angry, screaming and refusing to obey police orders. She was acting irrationally, and there was no telling what she’d do next. The officers’ efforts to immobilize the car by removing the key were unsuccessful, so the key remained on the floor. Brooks might’ve been able to reach it, start up the car and drive away. For all the officers knew, she might also have had a spare key.
The majority claims Brooks couldn’t reach the key on the floor and there’s no evidence she had a spare. Majority op. at 444 n. 5. But the relevant question isn’t whether there was a key within Brooks’s reach; it’s whether a reasonable officer could have thought there might be. Graham, 490 U.S. at 396-97, 109 S.Ct. 1865. Many people keep spare keys in the car for emergencies. And, although Brooks’s pregnancy might have made it difficult for her to reach the floor, the police couldn’t be sure what was within her grasp. The officers were entitled to take precautions for their own safety and that of others. Had they been less vigilant, Brooks might well have driven off and run over one of the children in the school zone. The officers were entirely right in refusing to take that risk. If the City awards them a commendation, as I suggest it should, I hope it carries a substantial cash bonus for safeguarding the lives and safety of innocent children.
The majority and concurrence get the law wrong, with dire consequences for police officers and those against whom they’re required to use force. My colleagues cast doubt on an effective alternative to more dangerous police techniques, and the resulting uncertainty will lead to more, worse injuries. This mistake will be paid for in the blood and lives of police and members of the public.
Today’s decision, though nominally a victory for the officers, is a step backward in terms of police and public safety. One can only hope the Supreme Court will take a more enlightened view.