**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TIMOTHY C. NELSON,
  *Plaintiff-Appellee,*

v.

CITY OF DAVIS; CALVIN HANDY;
MICHAEL MASON, Sergeant; JAVIER
BARRAGAN, Officer; BRANDON
JONES, Officer; CALVIN CHANG,
Officer; M. GARCIA, Officer,
individually; DOES, 1-100,
  *Defendants,*

and

JAMES HYDE, individually and in
his official capacity as Chief of
Police for the City of Davis; JOHN
WILSON, Sergeant, individually and
in his official capacity as a
Sergeant for the City of Davis,
  *Defendants-Appellants.*

No. 10-16256

D.C. No.
2:05-cv-01193-
MCE-KJM

7959

TIMOTHY C. NELSON,
                    *Plaintiff-Appellee,*

v.

CITY OF DAVIS; JAMES HYDE,
individually and in his official
capacity as Chief of Police for the
City of Davis; JOHN WILSON,
Sergeant, individually and in his
official capacity as a Sergeant for
the City of Davis; CALVIN HANDY;
MICHAEL MASON, Sergeant; JAVIER
BARRAGAN, Officer; BRANDON
JONES, Officer; M. GARCIA,
Officer, individually; DOES, 1-00,
                    *Defendants,*

and

CALVIN CHANG, Officer,
                    *Defendant-Appellant.*

No. 10-16257
D.C. No.
2:05-cv-01193-
MCE-KJM

TIMOTHY C. NELSON,
        *Plaintiff-Appellee,*

        v.

CITY OF DAVIS; JAMES HYDE,
individually and in his official
capacity as Chief of Police for the
City of Davis; JOHN WILSON,
Sergeant, individually and in his
official capacity as a Sergeant for
the City of Davis; MICHAEL
MASON, Sergeant; BRANDON JONES,
Officer; CALVIN CHANG, Officer;
DOES, 1-100,
                *Defendants,*

        and

JAVIER BARRAGAN, Officer; CALVIN
HANDY; M. GARCIA, Officer,
individually,
        *Defendants-Appellants.*

No. 10-16258

D.C. No.
2:05-cv-01193-
MCE-KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted
October 13, 2011—San Francisco, California

Filed July 11, 2012

Before: Betty B. Fletcher, Stephen Reinhardt, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

John A. Whitesides (argued), Sacramento, California, for defendants-appellants James Hyde and John Wilson.

Don Willenburg (argued), Michael T. Lucey, Mark S. Posard, San Francisco, California, for defendants-appellants Javier Barragan, Mary Garcia, and Calvin Handy.

Kelli M. Kennaday, Kim Johnston, Sacramento, California, for defendant-appellant Calvin Chang.

Adante D. Pointer (argued), John L. Burris, Oakland, California, for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

Timothy Nelson, a former student of the University of California at Davis ("U.C. Davis"), suffered permanent injury when he was shot in the eye by a pepperball projectile fired from the weapon of a U.C. Davis officer when U.C. Davis and City of Davis police attempted to clear an apartment complex of partying students. Officers shot pepperball projectiles in the direction of Nelson and his friends as the students stood

in the breezeway of the apartment complex, attempting to leave the party and awaiting instruction from the officers. The officers did not provide any audible warning prior to shooting towards the unarmed and compliant students, and never informed the young partygoers how to appropriately extricate themselves from the apartment complex in order to avoid becoming the target of police force. Formal complaints regarding the officers' use of force were filed with both departments on Nelson's behalf. After the complaints failed to result in a satisfactory investigation into police conduct Nelson filed suit in district court alleging, among other things, that his Fourth Amendment rights had been violated.[1]

The defendants moved for summary judgment. After the district court's denial of their motion, U.C. Davis officers Barragan, Chang and Garcia, as well as Chief Handy from U.C. Davis and Sgt. Wilson and Chief Hyde from the City of Davis, appealed the portion of the district court's order denying them qualified immunity for their conduct on the night of the shooting. This appeal requires us to determine whether the defendants violated Nelson's constitutional right to be free of unreasonable seizure and whether the contours of that right were sufficiently established that a reasonable officer would have been aware that the conduct was unconstitutional. We conclude that the defendants' actions amounted to an unconstitutional seizure of Nelson. Moreover, we hold that the law at the time of the incident should have placed the defendants on notice that the shooting of the pepperballs under the circumstances was an act of excessive force, thus precluding a judgment of qualified immunity.

---

[1]Because we are reviewing a denial of summary judgment, to the extent the parties disagree as to relevant facts "we view the evidence in the light most favorable to [Nelson,] the nonmoving party, and accept the version of all disputed facts most favorable to him." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 n. 1 (9th Cir. 2003).

## BACKGROUND

On April 16, 2004, approximately 1,000 people congregated at the Sterling Apartment complex in Davis, California for what was described by one participant as "the biggest party in history," for the annual Picnic Day festivities at U.C. Davis. U.C. Davis student Timothy Nelson was among the attendees. Due to the size of the party, traffic on Cantrill Drive, the street on which the apartment complex was located, became gridlocked and partygoers began to park illegally. The City of Davis police station is also located on Cantrill Drive a short distance from the apartment complex. When officers noticed the traffic violations and congestion on Cantrill Drive, Sgt. John Wilson instructed them to issue parking tickets to vehicles illegally parked. Officers eventually moved into the party to begin citing individual students for underage drinking. Once officers decided that they wanted a basis upon which to disperse the crowd, Wilson contacted the owner of the apartment complex and reported his observations, which, in addition to the large number of attendees and the underage drinking, included seeing individuals rocking a car and hearing bottles breaking. In response to this report, the owner requested that Wilson order non-residents to leave the complex.

Wilson and the other officers present began individually informing those around the fringes of the crowd that they were trespassing and that it was necessary for them to leave. Finding this method ineffective to disperse the nearly 1,000 partygoers, Wilson directed some of his officers to return to the station and to come back to the party in a police vehicle, which he hoped would have the effect of motivating partygoers to depart of their own volition. This strategy proved unsuccessful, as the police vehicle was soon overwhelmed by the crowd, including some individuals who threw bottles at the vehicle. Officers cleared a path for the police car by foot so that they could leave the complex and return to the station to regroup. After requesting and receiving backup from vari-

ous law enforcement agencies including the U.C. Davis Police Department, 30 to 40 officers assembled in riot gear at the southwest corner of the apartment complex and prepared to disperse the crowd. Defendants, U.C. Davis Officers Barragan, Chang and Garcia, were among these officers and were armed with pepperball guns. Pepperball guns are, in essence, paintball guns that fire rounds containing oleoresin capsicum ("OC") powder, also known as pepper spray. These rounds are fired at a velocity of 350 to 380 feet per second, *Nelson v. City of Davis*, 571 F.3d 924, 926 n.1 (9th Cir. 2009), with the capacity to fire seven rounds per second. They break open on impact and release OC powder into the air, which has an effect similar to mace or pepper spray. Pepperballs therefore combine the kinetic impact of a projectile with the sensory discomfort of pepper spray.

Defendants contend that, upon entering the complex, officers issued a verbal order to disperse, but acknowledge that they lacked any means of amplifying their voices above the raucous noise of the party, and, in fact, had to raise the visors on their helmets to communicate with each other at close range. The officers formed a skirmish line and moved through the crowd giving dispersal orders, but the majority of the crowd neither heard the order nor dispersed. The officers formed a second skirmish line, and prepared again to disperse the crowd. This time, the officers armed with pepperball guns assembled under Wilson's command in front of the others. Their purpose was to use their weapons in order to "disperse" the remaining students and make way for the advancing "skirmish line."

The officers gathered in front of a breezeway in the apartment complex that was described as a "very narrow and confined space." A group of fifteen to twenty persons had congregated in this breezeway on the ground floor, including Nelson and his friends. The students were attempting to leave the party but the police blocked their means of egress and did not provide any instructions for departing from the complex.

The students testified in their depositions that they stood in the breezeway awaiting instructions from the police. At various times they called out to the police, asking the officers to inform them what they wanted the students to do, and repeatedly raised their hands to show their willingness to comply. The students were disturbed by the presence of the police in full riot gear, and some of Nelson's female companions began to cry. Although there were scattered bottles being thrown throughout the complex and the upper levels of the breezeway, officers testified that no one from Nelson's group threw bottles at the police. Defendants claim that they warned the congregants to disperse, but the students did not hear any commands until after shots had already been fired. When the partygoers failed to disperse, Wilson ordered his team to "disperse them," at which point Barragan, Chang and Garcia shot pepperballs towards Nelson's group from a distance estimated by various parties to have been 45 to 150 feet away.

A pepperball launched from one of the officers' guns struck Nelson in the eye. He immediately collapsed on the ground and fell into the bushes where he writhed in pain for ten to fifteen minutes. Although unable to see, Nelson heard the officers proceed past where he lay, but none of them provided assistance. Some time later, Nelson was removed from the scene and driven to the hospital. Later that evening, Lieutenant Pytel, the incident commander at the scene learned that an individual was injured during the dispersal of persons at the apartment complex and sent Wilson to the hospital to ascertain whether that individual was injured by the officers' use of force and whether that individual had committed a chargeable offense. The officers were unable to find any crime with which to charge Nelson — thus no charge was ever filed against him. As a result of his injury, Nelson suffered temporary blindness, and "a permanent loss of visual acuity," and endured "multiple surgeries to repair the ocular injury he sustained." Additionally, as a result of his injury Nelson was forced to withdraw from U.C. Davis due to the loss of his athletic scholarship.

After the shooting, Nelson, his father, and a number of his companions who were present at the incident, filed incident reports with the Davis and U.C. Davis police forces. Despite their efforts, James Hyde, Chief of the Davis Police Department, approved of the decision not to accept the complaint for the Davis Police and did not conduct an investigation into the use of force. Calvin Handy, Chief of the U.C. Davis Police Department, authorized an internal investigation into the use of force, but relied solely on the written reports provided by the officers, which did not disclose that anyone had been seriously injured. On the basis of these reports he concluded that all policies had been followed. After the complaints filed on Nelson's behalf failed to result in a serious investigation into the use of force at the apartment complex, Nelson filed suit in district court under 42 U.S.C. § 1983 alleging, among other things, a violation of his Fourth Amendment right to be free from unreasonable seizure. In addition to officers Barragan, Chang and Garcia, the officers involved directly in the shooting, Nelson sued Hyde and Handy for their actions in ratifying the unconstitutional conduct of the officers. Neither the students nor the officers identified which of the officers shot the projectile which hit Nelson. Defendants Chief Hyde, Chief Handy, Sgt. Wilson, and Officers Barragan, Garcia, and Chang moved for summary judgment on the basis of qualified immunity. The district court granted summary judgment to the defendants on some of Nelson's claims, but held that, under Nelson's version of the events, a constitutional violation, an unreasonable seizure under the Fourth Amendment, had occurred and the defendants were not entitled to qualified immunity. The defendants filed an interlocutory appeal challenging the district court's denial of qualified immunity.[2] The

---

[2]The Appellees also challenge the district court's denial of summary judgment on the remaining state law claims. We do not have jurisdiction over those appeals. In addition, "California denies immunity to police officers who use excessive force." *See Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) (*citing Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 215 (1991)); *see also Venegas v. Cnty. of Los Angeles*, 153 Cal.

defendants challenge only the court's conclusions that the officers' conduct violated Nelson's constitutional right and that, at the time of the incident, it was clearly established that it did so.[3] *Liberal v. Estrada*, 632 F.3d 1064, 1074, 1076 (9th Cir. 2011).

## DISCUSSION

Qualified immunity shields an official from damages in a civil suit unless the plaintiff can make the showing that the official's actions violated a constitutional right, and that the right was "clearly established" at the time of the violative conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To survive the defendant's invocation of qualified immunity, the plaintiff must succeed on both prongs. We hold that Nelson has succeeded in alleging facts that, if true, would support the finding that the officers' conduct constituted a violation of clearly established law. The district court therefore did not err when it denied the officers qualified immunity for their use of force against Nelson.

---

App. 4th 1230, 1246 (2007) (holding that "qualified immunity of the kind applied to actions brought under [§ 1983] does not apply to actions brought under [Cal. Civ. Code] section 52.1"). Thus, even if this court were to conclude that the officers were entitled to qualified immunity, the state claims would be unaffected by this appeal.

[3]Officers Barragan, Chang and Garcia contend that the shooting was constitutionally permissible. Sgt.Wilson similarly asserts the constitutionality of the shooting and argues that his conduct, ordering the officers to shoot, by extension, could not have violated Nelson's constitutional right. Chief Handy and Chief Hyde are liable for their acts of ratifying the conduct of the officers only if the officers' conduct is found to be unconstitutional. The liability of all parties to this appeal is therefore dependent on holding that the shooting of Nelson constituted a violation of the constitution.

# I.

The officers first contend that Nelson was not seized under the Fourth Amendment. We reject this argument.

[1] "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted) (emphasis omitted). In this case, the U.C. Davis police officers took aim and intentionally fired in the direction of a group of which Nelson was a member. Nelson was hit in the eye by a projectile filled with pepper spray and, after being struck, was rendered immobile until he was removed by an unknown individual. Nelson was both an object of intentional governmental force and his freedom of movement was limited as a result. Under these facts, Nelson was unquestionably seized under the Fourth Amendment.[4]

---

[4]Even in the absence of Nelson's submission, the government's intentional application of force to Nelson was sufficient to constitute a seizure. As the Supreme Court has made clear, the mere assertion of police authority, without the application of force, does not constitute a seizure unless an individual submits to that authority. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991); *see also United States v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011) (submission is required to constitute a seizure in the absence of physical force). Conversely, when that show of authority includes the *application of physical force*, a seizure has occurred even if the object of that force does not submit. *Hodari D.,* 499 U.S. at 624-26 (an arrest, the "quintessential seizure of the person under our Fourth Amendment jurisprudence," occurs with "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee"); *see also Stevens v. Rose*, 298 F.3d 880, 884 (9th Cir. 2002) ("[A]n arrest is effected by the slightest application of physical force." (*quoting Hodari D.* at 625)); *Alexander v. City & Cnty. of S.F.*, 29 F.3d 1355, 1365 n.10 (9th Cir. 1994) (citing *Hodari* for proposition that "physical force constitutes a seizure under the Fourth Amendment"). As the Court has held, "an arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Hodari D.*, 499 U.S. at 626 (emphasis in original). In this instance, Nelson was an object of the officers' physical force and he submitted to that force. He was therefore seized under both the former and the latter definition of the term.

The officers argue that Nelson was not individually targeted by officers, and therefore his shooting was unintentional and incapable of causing a Fourth Amendment violation. This argument misapprehends the distinction between intentional and unintentional conduct that the Supreme Court has repeatedly held as determinative of the Fourth Amendment analysis. To constitute a seizure, the governmental conduct must be purposeful, and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff. *Compare Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 843-44 (1998) (no seizure occurred when police car unintentionally ran over a passenger who fell from a fleeing motorcycle during chase) *and United States v. Al Nasser,* 555 F.3d 722 (9th Cir. 2009) (no seizure occurred when police signaled to driver to continue driving and he misinterpreted signal and stopped), *with Brower v. Cnty. of Inyo*, 489 U.S. 593 (1989) (seizure occurred when fleeing driver hit road block intentionally erected by the police), *and Brendlin*, 551 U.S. 249 (seizure of passenger occurs when car stopped by police for the purpose of detaining the driver).

**[2]** The intentionality requirement is satisfied when the "termination of freedom of movement [occurs] *through means intentionally applied.*" *Brower*, 489 U.S. at 597 (emphasis in original). In the Court's opinion in *Brower*, such willful conduct is contrasted with the unknowing and unintentional act of accidentally pinning a fleeing felon to a wall with a police car when the brakes of an unoccupied police vehicle failed. For an act to be unintentional, the governmental conduct must lack the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition. As *Brendlin* stated, " 'an unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.' " *Id.* at 254 (quoting *Brower*, 489 U.S. at 596) (alterations in original). Regardless of whether Nelson was the specific object of governmental force, he and his fellow students were the undifferentiated

objects of shots intentionally fired by the officers in the direction of that group. Although the officers may have intended that the projectiles explode over the students' heads or against a wall, the officers' conduct resulted in Nelson being hit by a projectile that they intentionally fired towards a group of which he was a member. Their conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's person as well as the termination of his movement. Nelson was therefore intentionally seized under the Fourth Amendment.

The defendants contend that the intent of the officers was to hit the area around the students in order to douse them with pepper spray from the exploding pepperball projectiles in a tactic called "area contamination." Testimony from at least one officer, however, reveals that they were instructed by Wilson to "shoot at the crowd," and that at least one officer attempted to hit individual students within Nelson's group. Nonetheless, even were we to accept as true their contention on appeal that they intended to conduct area contamination, it is of no significance whether the expectation was to hit the group with the contents of the projectile or with the projectile itself. Whether the officers intended to subject the students to a shower of pepper spray via area contamination or intended to hit them with the pepperball projectiles themselves, the officers intentionally directed their use of force at the students. As the Supreme Court has recognized, a seizure occurs when an individual is "stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg." *Brower*, 489 U.S. at 599. Thus, the precise manner in which the officers' intentional use of force was ultimately experienced by Nelson does not affect the determination that a seizure has occurred. Although Nelson may have been struck in the eye with a pepperball that was intended to impact his body elsewhere, or was physically hit by the projectile when the officers sought only to spray him with its contents, the legal

consequence of the officers' actions is that a seizure of Nelson occurred.

**[3]** The officers also argue that their actions could not constitute a seizure because their intent was to disperse the crowd. The Supreme Court has repeatedly held that the Fourth Amendment analysis is not a subjective one. *See, e.g.*, *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011); *Brendlin*, 551 U.S. at 261; *Whren v. United States*, 517 U.S. 806, 813 (1996). "The intent that counts under the Fourth Amendment is the intent [that] has been conveyed to the person confronted, and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized." *Brendlin*, 551 U.S. at 260-61 (alterations in original) (internal quotation marks and citation omitted). Recently, the Court again emphasized that "the Fourth Amendment regulates conduct rather than thoughts." *al-Kidd*, 131 S.Ct. at 2080. Whether the officers intended to encourage the partygoers to disperse is of no importance when determining whether a seizure occurred. The officers took aim and fired their weapons towards Nelson and his associates. Regardless of their motives, their application of force was a knowing and wilful act that terminated Nelson's freedom of movement. It unquestionably constituted a seizure under the Fourth Amendment.

## II.

**[4]** A seizure results in a constitutional violation only if it is unreasonable. *Graham v. Connor*, 490 U.S. 386 (1989). Defendants contend that any seizure here did not meet that standard. The determination of unreasonableness requires us to decide "whether the totality of the circumstances justified a particular sort of . . . seizure," *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). To resolve this question we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (inter-

nal citations and quotation marks omitted). When the governmental interests at stake are substantial, a greater intrusion upon the Fourth Amendment rights of the person may be justified. Conversely, when the governmental interest is insubstantial, the application of even minimal force may be unreasonable. When balancing the degree of force used against the governmental interests, "it is the *need* for force which is at the heart of the [analysis]." *Headwaters Forest Def. v. Cnty. of Humboldt* (*"Headwaters II"*), 276 F.3d 1125, 1130 (9th Cir. 2002) (*quoting Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)) (emphasis in original).

## A.

The police arsenal includes many different types of force, which intrude upon the Fourth Amendment rights of the individual to varying degrees. We have recognized that "physical blows or cuts" often constitute a more substantial application of force than categories of force that do not involve a physical impact to the body. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (holding that the use of a progressive pain compliance device that inflicted temporary discomfort on the arrestees was not a substantial intrusion). The absence of concussive force is not determinative, however, and "[w]e have held that force can be unreasonable even without physical blows or injuries." *Bryan v. MacPherson,* 630 F.3d 805, 824 (9th Cir. 2010); *see also Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) (en banc) (pointing a weapon at unarmed child was unreasonable); *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc) (pointing a weapon at unarmed and nonthreatening individual was unreasonable). More specifically to the case before us, we have previously rejected the contention that the use of pepper spray is a "minimal" intrusion, due to the immediacy and "uncontrollable nature" of the pain involved. *Headwaters Forest Def. v. Cnty. of Humboldt* (*"Headwaters I"*), 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other grounds*, 534 U.S. 801 (2001); *see also Logan v. City of Pullman*, 392 F. Supp. 2d

1246, 1261 (E.D.Wash. 2005) (noting that pepper spray "is a 'dangerous weapon' under the criminal sentencing guidelines because it is 'capable of inflicting death or serious bodily injury.' " (quoting *United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999) (cert. denied))).

**[5]** Nelson was struck in the eye by a pepperball projectile, an object that "combine[s] the shock of kinetic impact (similar to paintballs) with the sensory discomfort associated with pepper spray." *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 982 (E.D. Cal. 2010). The intrusion on Nelson's person encompassed both the physical blow from the force of the projectile and the chemical effects of pepper spray. As a result of this injury, Nelson suffered significant damage to his eye, causing temporary blindness and a permanent loss of visual acuity. He also was forced to endure multiple surgeries to partially repair the damage caused by the pepperball projectile. The possibility of serious injury was apparent to the officers at the time of the shooting. According to the deposition testimony of current and former officers, the Commission on Peace Officer Standards and Training ("POST") guidelines specified that officers using the pepperball guns should avoid the head, face and groin due to the risk of causing serious injury. They testified that officers were advised not to shoot pepperballs indiscriminately or at individuals that were not posing a threat, nor were they permitted to shoot at any distance if there was a possibility that the target could be hit in the head or if other damage was possible. In addition to the general prohibition against using the weapon at any distance that was likely to cause injury, officers were warned that pepperball projectiles could not be accurately targeted beyond 30 feet. Although officers were trained that they could target walls or other surfaces at a distance up to 100 feet for the purpose of area saturation — allowing the pepperballs to break on a hard surface to render the surrounding area uninhabitable — they were specifically instructed to refrain from doing so if the targeted area itself was populated by individuals, due to the risk of injury. In addition to the expert testimony, the offi-

cers involved in Nelson's shooting specifically testified in their depositions that they were aware of these limitations and safety concerns surrounding the use of pepperball guns. The involved officers were therefore well aware of the risks that accompanied the use of pepperball projectiles, particularly when fired at a distance well beyond that approved under their guidelines.

**[6]** The actual harm caused to Nelson "is certainly relevant in evaluating the degree of the Fourth Amendment intrusion." *Bryan*, 630 F.3d at 824-25. We conclude that both the risk of harm and the actual harm experienced by Nelson were significant and must be justified by substantial government interests.

### B.

To evaluate the need for the government's use of force against Nelson we consider a number of factors, including "the severity of the crime at issue, whether . . .[Nelson] pose[d] an immediate threat to the safety of the officers or others, and whether he . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham*, 490 U.S. at 396.

**[7]** The first factor, the severity of the crime at issue, weighs heavily in favor of Nelson and against the use of the force employed by the officers. The police did not contend that Nelson or any of his companions were committing a crime at the time that he was shot. After he was incapacitated, the police did not place him under arrest but rather walked past him as he lay on the ground. Upon learning of an injured partygoer, Wilson investigated Nelson to determine whether there was a possibility that he could be charged with any crime and concluded that there was not. Consistent with the police's own investigation, Nelson has never been charged with any crime, and neither have any of his comrades.[5] Even

---

[5]The defendants now attempt to characterize Nelson as a "willful trespasser/rioter/non-disperser." This characterization is belied by the

if the group was trespassing, based on a willful refusal to leave the property, such an act is only a misdemeanor under California law. Cal. Pen. Code § 602(l)(1). Trespassing, while a legally-punishable offense, is a minor infraction that justifies, at most, only a minimal use of force. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). Although the officers plainly had an interest in clearing the apartment complex after permission to do so was obtained from the property owner, the desire to do so quickly, in the absence of any actual exigency, cannot legitimize the application of force when it is not otherwise justified. *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Thus, the lack of serious criminal behavior by Nelson, and the absence of exigency involved in the officers' desire to clear the apartment complex, significantly reduce the governmental interest involved, and thus provide only minimal, if any, justification for the use of force under *Graham*.

The fact that Nelson and his friends did not commit any chargeable offense, or, at most, a misdemeanor, weighs heavily against the defendants' use of force but does not necessarily in itself determine the outcome of the reasonableness analysis. As we have recognized in prior cases, the degree of threat posed by the suspect is the most important factor. *Bryan,* 630 F.3d at 826; *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). The "calculus of reasonableness must embody

---

defendants' own conclusion that Nelson had not committed a chargeable offense. Further, despite being unaware of the officers' orders to disperse, all members of Nelson's group contended that they were attempting to extricate themselves from the party when Nelson was shot, and thus were not "willfully trespassing," "non-dispersing," or "rioting," as the defendants allege. Regardless of whether the defendants now wish to contend that Nelson was a rioter, a "non-disperser," or an armed felon, the plaintiff has presented substantial evidence that would permit a jury to conclude that he was none of these and, as on review of the defendants' summary judgment motion we must construe the facts in the light most favorable to the plaintiff and cannot accept the defendants' assertions to the contrary, belated or otherwise.

allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation," *Robinson*, 278 F.3d at 1009 (quoting *Graham*, 490 U.S. at 396-97). We must also consider whether the officers reasonably perceived Nelson and his friends as posing a threat to the officers' safety or the safety of other civilians, regardless of whether they ultimately determined that no one had engaged in criminal conduct.

**[8]** While the threat analysis must be based on objective factors and not merely "a simple statement by an officer that he fears for his safety or the safety of others," *Deorle*, 272 F.3d at 1281, the undisputed facts support the conclusion that the officers did not reasonably believe Nelson or any of his companions posed a threat. Although the officers encountered individuals at various points during their sweeps who threw bottles or other debris at them, or haphazardly threw such items throughout the complex, the defendants admit that they never saw Nelson throw anything — in their direction or in any other direction. The same is true of the other students gathered with Nelson in the breezeway. More than one of the defendant officers stated in their depositions that they did not see anyone in Nelson's group throwing bottles or engaging in any other threatening or dangerous behavior. Additionally, the officers did not have a reasonable belief that Nelson or his friends had engaged in violent behavior or that he or the students on the breezeway with him might do so absent the officers' intervention by force. Even affording due weight to the tumultuous circumstances in which the use of force took place, there was no indication that Nelson or his colleagues — college students taking cover in the breezeway — represented a threat to anyone's safety. These individuals were observed prior to the officers' use of force and were seen not to be engaged in any violent conduct. Nonetheless, the projectiles were launched towards them. Under these circumstances, the general disorder of the complex cannot be used to legitimize

the use of pepperball projectiles against non-threatening individuals. *See Deorle*, 272 F.3d at 1281-83; *Headwaters I*, 240 F.3d at 1202-04; *Ciminillo v. Streicher*, 434 F.3d 461, 467-68 (6th Cir. 2006). When we consider the degree of threat posed by Nelson and his friends, we once again conclude that this factor weighs strongly against the use of force.

**[9]** Last among the factors considered in the *Graham* analysis is whether Nelson and his friends were actively resisting or attempting to evade arrest. As we have previously recognized, resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. Even passive resistance may support the use of some degree of governmental force if necessary to attain compliance, however "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* As already stated, the officers never attempted to place Nelson or his associates under arrest, so we need consider only whether the degree of force employed may be justified by a failure to comply with orders given by the officers. According to the events attested to by Nelson and his associates, which we must accept as true for purposes of this qualified immunity appeal, the police did not give orders to the group until after the shooting of the projectiles had already occurred. There can therefore be no failure to comply with orders, and Nelson's actions cannot be viewed as even passive non-compliance. Although Nelson may not have acted as the officers wished, their unannounced preferences are not substitutes for police orders. *See Deorle*, 272 F.3d at 1282 (noting the object of police force "certainly could not have been expected to comply with instructions that were never given to him").

Even if we were to accept the officers' version of the events, and assume that they issued orders to disperse without sound amplification and at a distance of 45 to 150 feet from the group, Nelson's failure to comply immediately could only

rise to the level of passive resistance. In prior cases, we have recognized that a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force. We have so held even when the extent of the resistance was substantially greater than Nelson and his friends' simple failure to disperse. *See, e.g., Young v. Cnty. of L.A.,* 655 F.3d 1156, 1165-66 (9th Cir. 2011) (arrestee's repeated refusal to reenter vehicle at officer's command is not active resistance); *Bryan*, 630 F.3d at 829-30 (arrestee's cursing and muttering to himself and exiting his vehicle despite being told to stay in car was not active resistance); *Davis*, 478 F.3d at 1055-56 (arrestee's actions in physically impeding the officer's search of his pockets was not active resistance); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (arrestee's refusal to remove hands from pockets and his reentry of his home despite officers' orders to place hands on head and walk towards them was not active resistance); *Headwaters II*, 276 F.3d 1125, 1130 (protestors that remained seated and used "black bear" devices to lock themselves to one another despite officers' orders to disperse did not actively resist); *cf. Jackson v. City of Bremerton*, 268 F.3d 646, 652-63 (9th Cir. 2001) (arrestee who repeatedly physically interfered with officer's arrest of a third party was actively resisting).

As our prior cases illustrate, active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders. To the contrary, where an individual's "resistance was [not] particularly bellicose," *Smith*, 394 F.3d at 703, we have held that various applications of force, including the use of pepper spray, *Headwaters II*, 276 F.3d 1125, and bean bag projectiles, *Deorle*, 272 F.3d 1272, were not reasonable. Therefore, even if Nelson heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance. There is therefore no justification for the use of force to be found in the third *Graham* factor.

**[10]** In addition to the considerations set forth in *Graham*, this court has recognized that although officers "are not required to use the least intrusive degree of force possible," *Forrester*, 25 F.3d at 807, "the availability of alternative methods," *Smith*, 394 F.3d at 701, is a relevant factor in determining whether the amount of force used in a particular instance was, in fact, reasonable. The officers contend that their use of the pepperball guns was necessary because their prior attempts to disperse the crowd had failed. The actions of the officers when they approached Nelson's group are in dispute; however various witnesses stated that the officers stood at a distance between 45 to 150 feet for a period of at least a few minutes without making known to the partygoers what they were expected to do. A number of officers then shot their weapons in the direction of the group, hitting the walls in addition to Nelson himself. Regardless of where the officers hoped their projectiles would land, they were aware from their training that they could not accurately target their weapons at a distance beyond thirty feet and that the projectiles fired from beyond that distance would likely stray from their intended path. Additionally, the officers had been trained that they were not to use pepperballs to hit individuals who were not posing a safety risk and that area contamination should not be attempted if the area was occupied due to the risk of injury. Thus the officers could have altered their tactics to bring them in compliance with their own training, which would have minimized the degree of force applied or eliminated the need for force altogether.

**[11]** Finally, we have held that "the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284 (reasoning that the absence of warning made use of force more unreasonable under the circumstances); *cf. Forrester*, 25 F.3d 804 (holding that use of force was not unreasonable, in part because protesters were given warning and instructions on how to comply before force was applied). Here, the officers claim to have instructed the partygoers to disperse, but it is

undisputed that they lacked any means with which to amplify their voices so that they could be heard over the din of the crowd. Witnesses who were with Nelson at the party stated that they did not hear any orders given until after Nelson had already been shot. Additionally, there is nothing in the record that indicates that the group was told prior to the shooting how they should comply with the dispersal orders (particularly when the officers were blocking their primary means of egress) or that force would be used against them if they did not behave in a particular manner. Thus the failure to give sufficient warnings also weighs against the government's decision to use force against Nelson and his associates.

**[12]** It is clear from the above that the governmental interest in applying force to Nelson or any member of his group, party-goers posing no visible threat and demonstrating no unwillingness to comply with the officers' orders, was minimal at best.

## C.

**[13]** The factors that justify the use of force must be weighed against the degree of intrusion posed by the particular type of force to determine if the use in the particular instance was reasonable. In the final analysis, the only governmental interest involved in the application of force to Nelson and his friends was the officers' desire to clear the complex of the party-going individuals. There is no evidence that the officers reasonably believed that Nelson or his friends posed a risk to the officers or any other persons; the officers had no interest in arresting them; and the group engaged in passive resistance, at most, by failing to immediately disperse if and when such an order was given. The officers' general interest in clearing the complex does not provide a legitimate governmental interest sufficient to justify the use of the force at issue. While it is undisputed that there were individuals hurling both bottles and expletives at officers, it is also undisputed that Nelson and his companions were not among them,

and the individuals causing the problems were not so numerous that the two categories of partygoers were indistinguishable. The application of force to Nelson's group therefore could not have been justified by the government's interest in stopping any and all disorderly behavior. Nor, even if we were to consider all the partygoers as a single entity, was the desire to clear the area sufficient justification for employing the force used by the government — the firing of pepperball projectiles with the potential kinetic impact of the projectile and the actual impact of the pepper spray, resulting in this instance in serious and permanent injury to one or more individuals. This force resulted in substantially more than a minimal intrusion and was not justified by the governmental interest in dispersing a group of student partygoers who could most likely be dispersed by less forceful means. We therefore conclude that the force used by the government was unreasonable and resulted in a violation of the Fourth Amendment.

## III.

Although we hold that the officers' use of force against Nelson was unreasonable, in order to deny qualified immunity to the officers in this case we must also determine that at the time of the incident it was clearly established that such conduct would violate Nelson's Fourth Amendment rights. The clearly established requirement protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. The determination whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Brosseau v. Haugen*, 543 U.S. 194 (2004). While this inquiry must be case specific, it is not so narrowly defined that it "allow[s] Appellants, and future defendants, to define away all potential claims," *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995). To the contrary, in applying the clearly established requirement,

courts recognize that "officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "To show that the right in question here was clearly established, [Nelson] need not establish that [the officers'] behavior had been previously declared unconstitutional, only that the unlawfulness was apparent in light of preexisting law." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998) (*quoting Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir.1997)) (internal quotation marks omitted).

**[14]** Despite the defendants' contentions to the contrary, it was clearly established prior to April 2004, the time of Nelson's shooting, that the intentional application of force which terminates an individual's freedom of movement results in a seizure. *See, e.g., Hodari D.*, 499 U.S. 621; *Brower*, 489 U.S. 593. All that remains is to determine whether the law was sufficiently clearly established that a reasonable officer would have been on notice that the use of pepperball projectiles directed towards Nelson and his friends was unreasonable under the circumstances.

**[15]** Although the *Graham* factors clearly weighed against the use of force given the slight governmental interest involved, further notice is required to inform a reasonable officer that his acts will amount to a constitutional violation. *Brosseau*, 543 U.S. at 199. Defendants correctly note that there is no binding precedent that has specifically addressed the use of pepperball projectiles. As we have previously held, however, "[a]n officer is not entitled to qualified immunity on the ground[ ] that the law is not clearly established every time a novel method is used to inflict injury." *Deorle*, 272 F.3d at 1286 (*quoting Mendoza v. Block*, 27 F.3d at 1362) (alterations in original) (internal quotation marks omitted). Pepperball projectiles, while a relatively new means of applying both pepper spray and concussive force to the target, merely combine two types of force that we have already recognized as unreasonable when aimed at individuals who pose no threat

and have committed, at most, minor offenses. *See Headwaters II*, 276 F.3d at 1130; *Deorle*, 272 F.3d at 1285.

In the cases in which we have held that the unreasonable application of a new form of force was not clearly established, our holdings were premised on the fact that these particular methods represented novel means of applying pain. *See, e.g., Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc) (not clearly established that the use of a taser to deliver an electric shock to the target or override the victim's nervous system was unreasonable); *Bryan*, 630 F.3d at 824, 833 (same); *Boyd v. Benton Cnty.*, 374 F.3d 773 (9th Cir. 2004) (not clearly established that officers' use of a sensory-impairing "flash-bang" device was unreasonable). Although the pepperball projectile is a relatively new mechanism by which a combination of concussive impact and chemical irritants can be applied to individuals by law enforcement, the type of pain inflicted is the same or greater than that caused by weapons that this court has already recognized constitute excessive force when applied individually under similar circumstances. Thus, just as our prior cases provided notice to all reasonable officers that targeting Nelson and his group with a projectile weapon with concussive force that could cause serious physical injury *or* targeting them with pepper spray was unreasonable under the Fourth Amendment, our precedents make it equally clear that utilizing a weapon against Nelson's group that combined *both* of these forms of force amounted to a constitutional violation.

In *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000), and *Headwaters I* and *II,* we held that the use of pepper spray, and a failure to alleviate its effects, was an unreasonable application of force against individuals who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others. Under these precedents, any reasonable officer therefore would have been on notice prior to April 2004 that the application of pepper spray to individuals such as Nelson and his

associates, whose only transgression was the failure to disperse as quickly as the officers desired, would violate the Fourth Amendment.

Similarly, our decision in *Deorle* provides notice to a reasonable officer that the firing of a projectile directed at Nelson or his colleagues would be unreasonable. In *Deorle*, we held that shooting an individual with a projectile, there a bean bag, that was also known to pose a greater risk of harm if it impacted the eye — and that *did* impact the victim's eye — was unreasonable. *Deorle*, 272 F.3d at 1285-86. Our conclusion was based on the fact that the target was suspected of no crime, only passively resisted officers, and posed a minimal risk of harm. *Id.* In *Deorle,* we recognized that the type of "force used . . . [was] capable of causing serious injury to the person shot, and that such injury may occur in any given instance." *Id.* at 1284. In so doing, we noted that the potential for injury must not be evaluated on the presumption that the "shot . . . will hit the precise part of the body at which it is aimed by the shooter," but rather based on its *capacity* for causing serious harm. *Id.* at 1285 n. 23. Despite not having previously recognized specifically the use of a beanbag projectile as an unreasonable application of force, we denied the defendant-officer qualified immunity and held that "[e]very police officer should know that it is objectively unreasonable to shoot — even with lead shot wrapped in a cloth case — an unarmed man who[ ] has committed no serious offense . . . has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285.

The dual nature of the pepperball projectile creates additional risks not present with a strictly projectile object, as used by the officer in *Deorle*. Nonetheless, even if considered as a purely projectile object, the officers in this case were aware that pepperballs fired from their guns could, as in this instance, cause substantial harm, and that there was a substan-

tial risk of hitting individuals in vulnerable areas given the inability to accurately target their weapons at the distance at which they fired them.[6] In light of our holding in *Deorle*, a reasonable officer would have known that firing projectiles, including pepperballs, in the direction of individuals suspected of, at most, minor crimes, who posed no threat to the officers or others, and who engaged in only passive resistance, was unreasonable.

**[16]** Under the factual circumstances present in this case, a reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals, would constitute unreasonable force in violation of the Fourth Amendment. The defendants contend that a consideration of the larger context in which the force was used compels a different conclusion. They are correct that the context of the officers' actions must be considered, and indeed in reaching our conclusion, we have taken into account the particular circumstances in which the use of force occurred on Picnic Day at U.C. Davis. We must nonetheless conclude that the unreasonableness of their conduct would have been known to any reasonable officers. Although the officers used force against Nelson and his

---

[6]Although we rely on our precedent to hold that the officers were on notice that their actions were unreasonable, we also note that the officers' own training on the use of pepperball guns put them on notice that they were not to target individuals with such weapons from the distance involved here or shoot persons who were not actively posing a risk; nor were they to use area contamination when the targeted area was occupied due to the risk of injuring individuals. The defendants in this case therefore had clear notice from their own training that the use of this particular weapon created a risk of injury and was unreasonable in the manner that it was deployed against Nelson and his friends. *See Drummond*, 343 F.3d at 1061-62 (citing the officers' training manuals as "relevant not only to whether the force employed in this case was objectively unreasonable . . . but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable").

group during their attempt to disperse a crowd, there was no exigency motivating the officers' actions and they were aware at the time of the shooting that they were using force that might lead to serious injury against non-threatening individuals who had committed no serious crime.

**[17]** The Tenth Circuit came to the same conclusion under strikingly similar circumstances. In *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008), the officers used a pepperball gun against plaintiff Fogarty when he attended a large demonstration against the Iraq war on a college campus. Fogarty testified that he did not hear or understand any orders from the police instructing the demonstrators to disperse prior to the use of force and, although arrested at the scene, Fogarty was never charged with any crime. As in the case before us, the Tenth Circuit's consideration of "each of the *Graham* factors balance[d] in [the plaintiff's] favor." *Id.* at 1161. Although the court acknowledged that none of its precedential opinions had discussed the use of pepperballs, it nonetheless held that the officers were on notice that the use of a new pain-compliance technique such as pepperballs "against nonviolent misdemeanants who do not flee or actively resist arrest," *id.* (*quoting Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)) (internal quotation marks omitted), constituted unreasonable force and that the circumstances did not present a "case . . . so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions." *Id.* at 1162. Although *Fogarty* was decided in 2008 and could not itself have provided notice that the firing of the pepperball guns in 2004 was unreasonable, the *Fogarty* court relied on our decisions in *Headwaters II* and *Lalonde* as the basis for its conclusion that the officers should have been well aware in March 2003, one year prior to the U.C. Davis shooting, that the use of a pepperball gun against a non-threatening individual committing a minor crime, even in the context of a large disturbance, was unreasonable. *Id.* at 1161-62; *see also Ciminillo*, 434 F.3d at 469 (citing *Deorle* in holding that it was clearly established in 2002, two years

prior to the Picnic Day shooting, that the firing of a beanbag projectile at a non-threatening individual at the scene of a riot was unreasonable); *Logan*, 392 F. Supp. 2d at 1265-68 (citing *Headwaters II* and *Lalonde* in holding that it was clearly established in 2002 that the indiscriminate use of pepper spray without warning against individuals in close proximity to a fight was unreasonable). We agree with the conclusion reached by the Tenth Circuit and the other courts. We hold that a reasonable officer should have known that the firing of the pepperball gun towards Nelson and his friends, given the minimal governmental interests at stake, was in violation of Nelson's clearly established Fourth Amendment right, even when that force was applied in the larger context of crowd dispersal.

The order of the district court denying qualified immunity to the defendants is AFFIRMED.