**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TAYLOR CHEAIRS, | No. 24-3163 |
| *Plaintiff - Appellant*, | D.C. No. 2:21-cv-01343-LK |
| v. | |
| CITY OF SEATTLE, and its officers, employees and agents; SEATTLE POLICE DEPARTMENT, and its officers, employees and agents; JOHN DOES, 1-10, unidentified members of the Seattle Police Department, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Lauren J. King, District Judge, Presiding

Argued and Submitted May 21, 2025
Seattle, Washington

Filed August 1, 2025

Before: Ronald M. Gould, Richard C. Tallman, and
Morgan B. Christen, Circuit Judges.

Opinion by Judge Christen

# SUMMARY[*]

## Excessive Force/Retaliation

The panel affirmed the district court's summary judgment for the City of Seattle, the Seattle Police Department, and several police officers in a 42 U.S.C. § 1983 action brought by Taylor Cheairs, who alleged that Officer Anderson used excessive force and retaliated against him in violation of the Fourth and First Amendments when Officer Anderson threw a blast ball diversionary device toward a crowd during a protest dispersal, injuring Cheairs, who was filming the protest.

A blast ball diversionary device creates a flash of light, emits a loud sound, and a chemical irritant two seconds after it is activated. Here, the blast ball hit the pavement near the curb where Cheairs was standing, bounced, and exploded as it struck him in the groin. Cheairs was seriously injured. The district court concluded that (1) there was no Fourth Amendment violation because Cheairs was not seized; (2) Cheairs's First Amendment claim failed because there was no evidence of retaliation; and (3) there could be no municipal liability without a colorable showing of a constitutional violation.

Affirming the district court's summary judgment for defendants on the Fourth Amendment claim, the panel held that although a reasonable fact finder could conclude that Cheairs was seized when Anderson struck him with the blast ball, Anderson's use of force was reasonable under the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

circumstances. A person is seized when an officer uses force with intent to restrain. On this record a reasonable fact finder could find that Anderson's use of force manifested an objective intent to restrain. The use of force was not excessive, however, given that the protesters at the front of the crowd, near whom Cheairs stood, objectively posed an immediate threat to the safety of officers, citizens, and property.

Cheairs failed to establish a viable First Amendment retaliation claim because he failed to raise a material question as to whether his filming of the protest was a substantial or motivating factor in Anderson's use of force against him.

The panel agreed with the district court that without a viable constitutional claim, Cheairs could not establish a claim for municipal liability.

---

**COUNSEL**

Jay S. Carlson (argued), Carlson Legal, Seattle, Washington; Jason B. Moore, Paradigm Law PLLC, Seattle, Washington; for Plaintiff-Appellant.

Thomas P. Miller (argued) and Stuart A. Cassel, Keating Bucklin & McCormack Inc. PS, Seattle, Washington, for Defendants-Appellees.

# OPINION

CHRISTEN, Circuit Judge:

On the evening of June 7–8, 2020, a crowd gathered in Seattle to protest the killing of George Floyd, and Taylor Cheairs decided to film the protesters' interaction with the police. Shortly after midnight, protesters advanced on the East Precinct police station in Seattle's Capitol Hill Neighborhood. The police ordered the crowd to disperse, and an officer threw several less-lethal munitions toward the crowd. One of the munitions was a blast ball grenade, a diversionary device that creates a flash of light and emits a loud sound and a chemical irritant two seconds after it is activated. The blast ball hit the pavement near the curb where Cheairs was standing, bounced, and exploded as it struck him in the groin. Cheairs was seriously injured.

Cheairs sued the City of Seattle, the Seattle Police Department (SPD), and several unnamed police officers pursuant to 42 U.S.C. § 1983. He claimed that the officer who threw the blast ball that injured him used excessive force and retaliated against him for filming the protest. The district court granted summary judgment in favor of Defendants, concluding that the City and SPD did not violate Cheairs's Fourth Amendment rights because he was not seized, and did not violate his First Amendment rights because there was no evidence that SPD acted in retaliation for Cheairs filming the protest. The district court concluded that there could be no municipal liability without a colorable showing of a constitutional violation. The City's motion did not seek a ruling that Defendants were entitled to qualified immunity.

We affirm the district court's judgment. Though a reasonable fact finder could conclude that Cheairs was seized when an SPD officer struck him with a blast ball, the officer's use of force was reasonable under the circumstances. Cheairs failed to establish a viable First Amendment retaliation claim because he did not raise a material question as to whether his filming of the protest was a substantial or motivating factor in the SPD officer's use of force against him. We agree with the district court that without a viable constitutional claim, Cheairs could not establish a claim for municipal liability.

# I

Protests erupted across the United States after a Minneapolis police officer killed George Floyd while arresting him on May 25, 2020.[1] Demonstrations began in Seattle a few days later. The protests caused significant property destruction in the downtown area, but they took place throughout the city, including the Capitol Hill neighborhood. The protests spurred Seattle Mayor Jenny Durkan to issue a proclamation of civil emergency on May 30 that delegated authority to Seattle's Fire and Police Chiefs to direct any measures necessary to protect people and property and to maintain public order.

---

[1] For our statement of facts, we rely on SPD's Police Manual; the blast ball manufacturer's specifications; the Seattle Police Operations Center computer-aided dispatch log; SPD officers' post-incident reports; SPD officers' body-cam videos from June 7–8, 2020; Cheairs's sworn deposition testimony; and the two videos Cheairs filmed of the incident. Officer Anderson was not deposed. In large part, we rely on the video recordings in the record. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (admonishing courts to "view[] the facts in the light depicted by the videotape" when unchallenged). The parties do not dispute the accuracy of these materials.

On June 7, 2020, the day before Cheairs was injured, protesters marched down Interstate 5; threw rocks, bottles, and other projectiles at police officers; lit patrol cars on fire; and threw Molotov cocktails. By then, after more than a week of protests, SPD was following a revised "Incident Action Plan" intended "to help de-escalate the highly energized crowd" and to reduce the protesters' ability to verbally and physically engage with SPD personnel. Among other facilities, SPD planned to protect Capitol Hill's East Precinct police station near the intersection of 12th Avenue and Pine Street. At least three violent clashes between police and protesters had already occurred near the East Precinct, and the streets around the precinct had been closed for several days.

SPD equipped the officers responding to the protests with less-lethal munitions, including blast balls.[2] SPD used two types of blast balls on the night of June 7–8: inert and oleoresin capsicum (OC). Inert blast balls create a flash of light and emit a loud noise. OC blast balls create a flash of light, emit a loud noise, and also disperse OC powder, commonly known as pepper spray. Officer Carl Anderson was SPD's Chemical Agent Response Team Leader on the night Cheairs was injured. His assignment required special training and made him responsible for deploying blast balls

---

[2] The manufacturer's label dubs these munitions "rubber ball blast grenades," and the parties refer to them as "grenades" and "blast balls." They are about three inches in diameter, are activated by pulling a pin, and operate like grenades. Once activated, there is a 1.5-second delay that initiates the fuse assembly separation, followed by another 0.5-second delay before detonation. We use the terms "blast ball" and "blast ball grenade" because those terms are used in SPD's Police Manual and by the manufacturer.

and other munitions as necessary to protect police officers and citizens, and to prevent significant property damage.

SPD planned to use various barricades on June 7 to protect the East Precinct and to maintain distance from that night's anticipated crowd. SPD had installed heavy-duty metal fencing at several intersections near the East Precinct station to prevent protesters from interfering with police entering and exiting the facility. If protesters breached the fence, SPD planned to form a line of officers backed by a line of National Guard troops to prevent the protesters from advancing on the precinct. The police captain leading the response as the incident commander was prepared to use a public address system, if necessary, to warn the protesters to return to the other side of the fence.

The barricades did not hold. At 7:17 p.m., protesters breached the police fencing, and the incident commander used the public address system to issue multiple warnings directing the protesters to remain on their side of the barricades. He later recounted in his use-of-force report that protesters disregarded his announcements and continued crossing over to the police side of the fence. At approximately 7:43 p.m., protesters established their own line using some of the fencing the police had installed for crowd control. Rather than moving back as directed, the crowd began slowly inching toward the police line at 11th and Pine. At approximately 7:54 p.m., SPD issued an additional warning to the protesters breaching the police line, and about a minute after that, the officers on the line were ordered to activate their body cameras.

Interactions between SPD and protesters continued to escalate. Protesters continued to disassemble the fencing the police had installed to close off the streets surrounding the

East Precinct, and the Operations Center log indicates that at 9:20 p.m., a group of protesters on the police side of the barricades was "making announcements to burn down the precincts." From 9:23 p.m. to 11:38 p.m., SPD warned the protesters multiple times to refrain from removing fencing and advancing toward the officers. However, the Operations Center log noted protesters shining lasers into SPD officers' eyes at 9:24 p.m., 10:26 p.m., and 12:07 a.m.; breaking fencing and using it as weapons at 10:10 p.m.; throwing bottles at 11:36 p.m.; and throwing a bottle with a chemical irritant at 11:52 p.m.

Shortly after midnight, the situation significantly escalated. Some protesters were holding plywood shields with "nails in them concealed by paint," and, at about the same time, the video record shows protesters throwing bottles, rocks, and fireworks at the police line. As the incident commander later described it, the protest had devolved into "a riot," and he determined that "it was tactically unsound to remain in place." The incident commander ordered the line officers to advance from midblock on Pine toward 11th,[3] and authorized the officers on the line to use less-lethal munitions to break up the crowd. At approximately 12:04 a.m., the incident commander authorized the officers to begin deploying OC blast balls. Using a public address system, SPD broadcast several orders for the crowd to immediately disperse. The dispersal orders warned those in the crowd that they would be subject to arrest if they did not comply. The announcements also gave notice that the police would use chemical agents or less-lethal munitions, and informed protesters of two egress

---

[3] King County Maps and Apps Gallery, *King County iMap*, https://gismaps.kingcounty.gov/iMap/ (last visited July 25, 2025).

routes they could use to leave the area safely. As the officers slowly advanced, they were again assaulted by the crowd with projectiles. After SPD began deploying less-lethal munitions, the video record and witness statements show that the crowd alternated between retreating in response to tear gas and blast balls, and moving forward to reengage with the police line. At 12:05 a.m., the record shows that the police had created space between the protesters and the police line, but by 12:11 a.m., the Operations Center log indicates the crowd was surrounding the officers on three sides.

Meanwhile, Cheairs was having dinner on Capitol Hill. He was aware of the ongoing protests and out of curiosity he decided to walk toward the "interaction between the protesters and the police" after dinner to "see and film what was happening at the front." Cheairs denied that he was there to participate in the protest and the record contains no evidence that he did. The video record shows that Cheairs walked up to a position on a sidewalk at the intersection of 11th and Pine that was abreast of all but a few of the protesters at the front of the crowd. As he approached, some protesters were dispersing in the opposite direction. Cheairs positioned himself to get a better vantage point but stayed on the sidewalk. The video record suggests that, at the time Cheairs arrived, about 15 yards separated the protesters from the police line. The audio portion of Cheairs's first iPhone recording captured one of SPD's dispersal orders.[4]

----

[4] Cheairs's iPhone recorded the dispersal order that was issued at 12:08 a.m. The order consisted of the following: "I command all those assembled at 11th and Pine to immediately disperse, which means leave this area. If you do not do so, you may be arrested or subject to other police action. Other police action could include the use of chemical

Officer Anderson's body-cam video recorded that he threw several blast balls in the ten minutes between 12:04 and 12:14 a.m. One of the blast balls Officer Anderson threw overhand landed on the pavement near the curb where Cheairs was standing, bounced and exploded, and struck Cheairs in the groin as he was filming the protest. Cheairs later described feeling "some of the worst [] acute pain" he had ever experienced. His pants were shredded and he was bleeding from his groin, but he was able to walk away from the protest and drive to a nearby hospital where he received emergency medical attention. Cheairs was treated at a burn clinic about a week later. His physical injuries healed in approximately six weeks. He testified that he also received psychological counseling because of the trauma associated with the experience.

## II

On October 1, 2021, Cheairs filed a complaint pursuant to 42 U.S.C. § 1983 in the United States District Court for the Western District of Washington. The complaint requested damages for violations of his First and Fourth Amendment rights. The complaint did not name any individual officers, but in a May 2022 response to Cheairs's discovery requests, Defendants identified Officer Anderson as the SPD officer who threw the blast ball that struck Cheairs.

---

agents or less lethal munitions, which may inflict significant pain or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: Westbound on Pine. Southbound on Twelve." Cheairs later testified at his deposition that he did not know if he heard this dispersal order and that there were many different "extremely loud" sounds happening.

Defendants filed a motion for summary judgment, which the district court granted.  The court first ruled that Defendants did not violate Cheairs's Fourth Amendment rights because Officer Anderson's use of force did not constitute a seizure.  The court also ruled that Cheairs's First Amendment claim failed because he was present at the protest in violation of a lawful order to disperse and because he did not show that SPD used force in retaliation for engaging in a protected First Amendment activity.  The court concluded that Cheairs's failure to establish a colorable claim for a constitutional violation foreclosed any municipal liability claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## III

## A

We review de novo the district court's rulings on summary judgment.  *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 815 (9th Cir. 2023).  At the summary judgment stage, we view disputed facts in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, we are "limited to considering what facts the officer[s] could have known at the time of the incident." *Sabbe*, 84 F.4th at 816 (citations omitted).  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## B

## 1

Cheairs first argues that SPD used excessive force against him in violation of his Fourth Amendment rights. The Fourth Amendment guarantees the right to be free from unreasonable seizures.  *Torres v. Madrid*, 592 U.S. 306, 311 (2021).  As we recently explained, the Fourth Amendment

protects against "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Sanderlin v. Dwyer*, 116 F.4th 905, 912 (9th Cir. 2024) (citation omitted).

Before we consider whether the force used was reasonable, we first address whether Cheairs was seized within the meaning of the Fourth Amendment. *See Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022).[5] "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). "A seizure requires the use of force *with intent to restrain*." *Torres*, 592 U.S. at 317 (emphasis in original); *see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "Accidental force will not qualify. Nor will force intentionally applied for some other purpose." *Torres*, 592 U.S. at 317 (citation omitted); *see also Nelson*, 685 F.3d at 876 ("To constitute a seizure, the governmental conduct must be purposeful and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff."). It is well settled that the inquiry into the

---

[5] The district court observed that Cheairs had not specifically responded to Defendants' allegation that the blast ball did not effectuate a seizure, but the court went on to address the merits of the City's argument and ruled that no seizure had occurred. On appeal, Cheairs denies waiving this argument and the City maintains that the court did not rely on waiver in reaching its decision. Because the district court extensively discussed the merits of the seizure issue, and the City addressed it in depth at the trial court and in its brief on appeal, we exercise our discretion to reach it as well.

intentionality of the use of force considers "whether the challenged conduct *objectively* manifests an intent to restrain." *Torres*, 592 U.S. at 317 (emphasis in original); *Sanderlin*, 116 F.4th at 913; *see also Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) ("The intent that counts under the Fourth Amendment is the intent conveyed, not the officers' subjective intent.") (citation and internal quotation marks omitted).

An individual need not remain immobilized to plead a cognizable Fourth Amendment claim, because "brief seizures are seizures all the same." *Torres*, 592 U.S. at 318, 325 (holding that seizures may occur "even if the person does not submit and is not subdued"). Our recent decision in *Sanderlin* cited with approval cases from sister circuits recognizing that seizures had occurred when officers used force to restrict the ability of individuals to move about freely, even if for a brief period of time, and where the force was not applied to effectuate an arrest. 116 F.4th at 912 (citing *Salmon v. Blesser*, 802 F.3d 249, 254 (2d Cir. 2015) (concluding a seizure occurred where an officer used "painful force to control [a person's] movements"); *Hess v. Garcia*, 72 F.4th 753, 763 (7th Cir. 2023) ("Physically grabbing someone is likely to be a seizure because it is likely to restrict movement, at least briefly."); *West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014) (holding a seizure occurred when a deputy sheriff physically grabbed plaintiff's wrist for a brief time); *United States v. Delaney*, 955 F.3d 1077, 1083 (D.C. Cir. 2020) (recognizing "officers need not totally restrict a citizen's freedom of movement" to effectuate a seizure (quoting *United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015))).

*Sanderlin* considered a Fourth Amendment claim that arose after a non-violent protester at a George Floyd protest

held in California was injured by a police officer's deployment of a crowd-control munition fired from a high-velocity launcher. *Id.* at 908. Sanderlin was standing on a sidewalk holding a protest sign when a police officer fired a foam baton round directly at him. *Id.* at 909. Discovery showed that Sanderlin's sign was blocking the police officer's view of two subjects hiding behind a dumpster. *Id.* The video record showed that the officer shouted, "I'm going to hit you, dude. You better move!" and then fired a 40mm foam baton round that hit Sanderlin's groin. *Id.* Sanderlin suffered a severe injury that required emergency surgery. *Id.* He filed suit pursuant to 42 U.S.C. § 1983, arguing that the officer's use of force violated his Fourth Amendment rights. *Id.* The officer contended that the use of the foam baton round did not constitute a seizure because he had intended to disperse Sanderlin rather than to apprehend or restrain him. *Id.* at 912.

We affirmed the district court's decision denying the officer's motion for summary judgment. In doing so, we reiterated that the officer's subjective intent is not the focus of the Fourth Amendment analysis, and we concluded that firing a foam baton round at the plaintiff's groin constituted a seizure because the record showed that the 40mm foam baton launcher used in that case was "chiefly designed, intended, and used for the purpose of incapacitating its target." *Id.* at 913. We concluded that a seizure had occurred because "there can be no reasonable dispute that 'incapacitating' an individual by firing a projectile at them is an act that 'meaningfully interferes' with their freedom of movement." *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984)) (alteration adopted). In reaching this conclusion, we considered the police department's training manual, which memorialized that the foam baton

munition was designed and intended to cause incapacitation or serious injury, especially when aimed at the groin. *Id.* We also considered the video record, which corroborated Sanderlin's sworn statement that after he was struck, he fell to the ground and was unable to move. *Id.* at 912. The fact that Sanderlin's freedom of movement was only temporarily restricted—his wife later helped him to his feet and he was able to walk away—did not change the outcome because "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id*. at 912 (quoting *Torres*, 592 U.S. at 325).

*Sanderlin* instructs that design, intent, and use of munitions are factors we consider when determining whether deployment manifests an objective intent to restrain. *Id*. at 913. Here, looking first at design and intent, the manufacturer's specifications for the OC blast balls that Officer Anderson used the night Cheairs was injured state: "The purpose of the Rubber Ball Blast grenade is to minimize the risks to all parties through temporary distraction or disorientation of potentially violent or dangerous subjects." The manufacturer further explains that the device is designed and intended to serve as an "irritant, distraction and/or disorientation device for crowd management." *Cf. Sanderlin*, 116 F.4th at 913.

It seems plain that a fact finder could decide that munitions that are fired at high velocity, such as foam baton rounds or pepperballs,[6] are "chiefly designed" to inflict a

---

[6] A pepperball is "an object that combines the shock of kinetic impact (similar to paintballs) with the sensory discomfort associated with pepper spray." *Nelson*, 685 F.3d at 878 (citation and internal quotation marks omitted).

greater degree of force than a hand-thrown blast ball grenade that creates a flash-bang and cloud of pepper spray. *Id.* at 913. A reasonable fact finder could certainly decide that a device like a pepperball was designed to incapacitate. *See Nelson*, 685 F.3d at 873 (finding a seizure occurred where officers used devices we described as "in essence, paintball guns" to fire rounds containing pepper spray at 350–380 feet per second). But the grenade that Officer Anderson used was not designed to be deployed at high velocity; it was designed to be thrown by hand. To be sure, the record shows that the detonation of the blast ball causes the grenade casing to separate two seconds after it is deployed, and as the manufacturer's warning makes clear, that explosion is certainly capable of causing serious injury. Nevertheless, we cannot say that the record shows the *design* of the munition used in this case was comparable to the high-velocity pepperballs in *Nelson* or designed to incapacitate like the foam baton used in *Sanderlin*.

In addition to considering design, we consider the way munitions are used because the way munitions are employed may also manifest an objective intent to restrain and thus result in a seizure. *Id*. at 913. The SPD Manual reflects SPD's policy that officers must have completed SPD blast ball training in order to deploy this type of munition, and it requires that the use of each blast ball must be individually justified. The Manual cautions that the preferred method of blast ball deployment is an underhand toss, "bowling style," but it permits throwing blast balls overhand "when the need for a farther deployment or the need to get around an obstruction outweighs the risk created by [overhand deployment of] the separating sub-munition." The SPD Manual categorizes the force associated with various police actions as de minimis, "handcuff discomfort," Type I, Type

II, Type III, and deadly force.  The deployment of blast balls away from people is classified as Type I force, and within close proximity to people as Type II force that may rise to Type III if deployment results in certain types of injury or complaints of injury.

Officer Anderson threw the blast ball that injured Cheairs overhand, but the video record corroborates his statement that he did so because he was behind a number of other officers standing on the front line.  Importantly, the blast ball that struck Cheairs landed on the pavement between the crowd and police, skidded across the pavement until it struck a curb, bounced, then exploded.  Throwing this device in the space between the protesters and the police is consistent with an objective intent to disperse the crowd and "create space" between the protesters and the police line because protesters can be expected to move back from a cloud of dispersing pepper spray.  Indeed, the video record shows that the deployment of less-lethal munitions in the space between the crowd and the police line did move the crowd back.  Had the device been thrown overhand and *into* the crowd of protesters, the use of the blast ball objectively would be more likely to risk injury for the reasons explained in SPD's Manual—"the risk created by the separating sub-munition" at head height.  Throwing a blast ball grenade into a crowd would also be less likely to create space between the protesters and the police line because, for people standing near the front of a crowd, moving *away* from a cloud of pepper spray emerging behind them would require moving *toward* the police line.  Had the blast ball been deployed overhand and into the crowd, rather than into the space *between* the crowd and the police line, the use would not be consistent with an objective intent to push the crowd back and away from the police.

On the record before us, we conclude that whether the use of force in this case manifested an objective intent to restrain Cheairs is not capable of resolution at the summary judgment stage.  At the outset, we note that for the same reasons that Sanderlin's ability to walk away was not dispositive of whether a seizure occurred in that case, Cheairs's ability to walk away from the protest in Seattle does not foreclose his argument that he was seized when Officer Anderson struck him with a blast ball.  But there are facts in the record that would allow a reasonable jury to decide Cheairs was not seized.  First, it is uncontested that the device was thrown by hand, not fired at high velocity. Second, the video record corroborates that there was a barrier to deploying the device in the preferred "bowling style" underhand method, and while SPD policy discourages overhand deployment, it does not prohibit it.  Third, the device that injured Cheairs landed between the crowd and the police line, and there is no evidence that Officer Anderson aimed at Cheairs rather than the space between the crowd and the police.  From these facts, a reasonable jury could decide that the use of force was objectively intended to push back the crowd, rather than to restrain the crowd or any member of the crowd.  Indeed, the record shows the crowd did retreat multiple times when less-lethal munitions landed in the space between the crowd and the police.

However, a reasonable jury could also reach the contrary conclusion because the blast ball that injured Cheairs is capable of inflicting very serious injury—if not by design, then if used in the way we have described.  Thrown overhand, as it was here, a blast ball presents a greater risk of injury if it detonates at head level, and Officer Anderson threw the device in the direction of the crowd.  *See Nelson*, 685 F.3d at 877 (finding seizure because the officers'

"conduct was intentional, it was aimed towards [the plaintiff and the group he was standing with], and it resulted in the application of physical force to [the plaintiff's] person as well as the termination of his movement"). Finally, it is evident from the video record that the crowd's proximity to the police line was fluid as protesters alternated between engaging closely with the police and falling back in response to SPD's use of less-lethal munitions, and the video record does not allow a clear picture of what a reasonable officer in Officer Anderson's position would have been able to see in the moments before he threw the blast ball that injured Cheairs.

**2**

Whether Cheairs's Fourth Amendment claim survives the motion for summary judgment depends on whether the record supports his contention that a jury could find that Officer Anderson's use of force was unreasonable. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (explaining that the critical question in determining whether a seizure comports with the Fourth Amendment is whether the use of force was objectively reasonable under the circumstances). This question requires us to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion" to determine whether the government's use of force was excessive. *Scott*, 550 U.S. at 383 (quotation omitted). The government's interest in the use of force depends on: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Sabbe*, 84 F.4th at 822; *Graham*, 490 U.S. at 396–

97. The "immediate threat" factor is the most important. *Sabbe*, 84 F.4th at 822.

When balancing these interests, we consider the "totality of the circumstances," *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014), including the "particular situation" and the "particular type of force" used. *Scott*, 550 U.S. at 382. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We allow for an officer's need "to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397.

By midnight on June 8, the government had strong justification to use some degree of force to respond to serious threats to police, the public, and property. The comprehensive record disproves Cheairs's assertion that the crowd was "largely peaceful." Officers' body cams recorded, and Cheairs's own videos confirm, that protesters near Cheairs were throwing projectiles, launching fireworks, and shining lasers at officers in the minutes before Officer Anderson threw the blast ball that struck Cheairs. The protest had gone on since the afternoon and the degree of violence appeared to be escalating. There is no question that SPD had given orders to disperse before Cheairs was injured, and the announcements included directions for safely exiting the area. Some of the protesters complied, but others ignored the orders in violation of Washington law. *See* Wash. Rev. Code § 9A.84.020(1)(a)–(b) (providing that failure to comply with a lawful order to disperse is a misdemeanor offense). The Operations Center log includes entries reporting that protesters had threatened to burn down the nearby precincts.

There is little doubt based upon the video evidence that a reasonable officer in Officer Anderson's shoes would have concluded, before Officer Anderson deployed the OC blast ball grenade that injured Cheairs, that probable cause existed to arrest at least some of the protesters for disregarding the dispersal orders, or for assaulting or attempting to assault police officers on the line, at the intersection of 11th and Pine. Thus, the government had an important interest in using force to protect officers and bystanders and to prevent serious property damage.

Although following department policy does not necessarily guarantee that an officer's conduct will be constitutional under the Fourth Amendment, we also consider that Officer Anderson deployed the blast ball that struck Cheairs in accordance with SPD policy and in response to an increasingly hostile, threatening crowd. The SPD Manual provides that "when feasible, officers will not deploy blast balls until a dispersal order has been issued to the crowd, the crowd has been given a reasonable amount of time to comply, and a supervisor has authorized the deployment." When protesters continued shining lasers and throwing projectiles at the line of officers, SPD issued another dispersal order, then deployed OC blast balls. Key to our analysis, the blast ball that injured Cheairs struck the pavement before it detonated. Had it been thrown in a way calculated to explode at head height, it would have presented a far greater risk of injury and thus could have constituted an unreasonable use of force. *See Nelson*, 685 F.3d at 878.

On the record before us, we conclude that it was reasonable for the police to perceive that the protesters at the front of the crowd, near whom Cheairs stood, objectively posed an immediate threat to the safety of officers, citizens, and property. Therefore, having considered the totality of

the circumstances, we conclude that the force Officer Anderson employed was not excessive. *Cf. Young v. City of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) (holding that pepper spray and baton blows were excessive uses of force against a non-compliant but non-violent subject who was seated on a curb and then prone and handcuffed on the sidewalk) (citing *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130–31 (9th Cir. 2002) (holding that directly applying pepper spray to the eyes of non-violent environmental protesters who refused to unchain themselves, by holding Q-tips doused with pepper spray to the corners of their eyes, was unnecessary and excessive force)).

Cheairs urges us to consider an order entered by a different district court judge in the Western District of Washington in response to the same protests. That order enjoined SPD "from employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations." *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, Case No. 2:20-cv-00887-RAJ (W.D. Wash. 2020), Dkt. No. 34. But that order was issued on June 12, 2020, several days after Cheairs was injured, and it addressed the use of force against peaceful protesters. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene," based only on what was known at the time of the incident. *Graham*, 490 U.S. at 396. Because it post-dated Cheairs's injury, the June 12 temporary restraining order

does not impact our analysis of the reasonableness of the force that injured Cheairs.[7]

Cheairs also argues that we should take into account evidence that Officer Anderson threw another blast ball overhand shortly after deploying the blast ball at issue in this case. That blast ball struck a protester in the chest and caused serious injury. This evidence is relevant because it confirms that the munition that injured Cheairs is capable of inflicting very serious injury, even if it is not designed to do so. But it does not support Cheairs's contention that the force Officer Anderson used was excessive under the circumstances. Our precedent requires that we consider the facts that were known to Officer Anderson at the time of the incident. *Graham*, 490 U.S. at 396. A reasonable officer in Officer Anderson's position would justify the deployment of OC blast balls aimed at the space between police and protesters as necessary to increase the distance between them. *Id.*

Finally, Cheairs relies on *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) to argue that Officer Anderson used excessive force. This precedent does not persuade us that Officer Anderson's use of force was unreasonable, because the facts that pertained to the reasonableness of the officers' use of force in *Nelson* and *Young* are easily distinguishable from the facts in this case.

In *Nelson*, the police responded to an apartment complex where approximately 1,000 partygoers had gathered for the

---

[7] Accordingly, we deny the motion for judicial notice of parts of the docket in the *Black Lives Matter Seattle-King County* Case (Dkt. No. 25).

annual Picnic Day festivities at the University of California at Davis.  *Id.* at 872–73.  The police responded to a request from a property owner "in the absence of" any exigency.  *Id*. at 880.  At some point, some members of the crowd began throwing objects at the police, but the police testified that none of the objects came from the direction where Nelson and his friends were standing.  *Id*.  The police ordered the crowd to disperse, but they did not give Nelson and his friends an opportunity to comply with the order and the crowd had no path to exit safely.  *Id.* at 872, 874.  Discovery showed that the students "called out to the police, asking the officers to inform them what they wanted the students to do, and repeatedly raised their hands to show their willingness to comply."  *Id.* at 874.  Without warning, the police shot pepperballs toward the crowd at high velocity and struck Nelson in the eye, severely injuring him.  *Id*. at 872.

The group of college students targeted with pepperballs in *Nelson* was, at most, passively resisting police dispersal orders and not "engaging in any other threatening or dangerous behavior."  *Id.* at 880.  In contrast, the large crowd of protesters at 11th and Pine had ignored multiple dispersal orders that included directions to exit, and the crowd was growing increasingly violent.  The severity of the protesters' crimes in this case and the immediate threat to the safety of the officers, the public, and property easily distinguish the reasonableness of the use of force here from the reasonableness of the use of force in *Nelson*.**[8]**  *See Graham*, 490 U.S. at 396–97.

---

[8] Though *Nelson*'s analysis of the reasonableness of the officers' use of force is distinguishable, *Nelson*'s seizure analysis does provide a helpful guidepost, and it closely tracks the seizure analysis in *Sanderlin*.  In both cases, officers shot projectiles into crowds at high velocity, intending to

The facts of *Young* are similarly distinguishable. *Young* involved a traffic stop in which an individual declined to get back into his car after exiting to hand his vehicle registration to a police officer who was writing a traffic citation. *Young*, 655 F.3d at 1159. After the plaintiff refused to reenter his car, the officer pepper-sprayed him without warning as he was sitting on the curb and later struck him repeatedly with a baton after he was handcuffed and lying face-down on the ground. *Id.* at 1159–60. We observed that it is rarely, if ever, necessary "for a police officer to employ substantial force without warning against an individual who . . . is not resisting arrest or does not pose any apparent threat to officer or public safety." *Id*. at 1166–67. The facts in *Young* are not at all comparable to the facts that warranted the use of force in this case.

In light of all the relevant circumstances, we affirm the district court's order granting summary judgment on Cheairs's Fourth Amendment claim.

## C

Cheairs argues that Officer Anderson retaliated against him for filming the protest, thereby violating his First Amendment rights. *See Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). To establish a First Amendment retaliation claim, Cheairs must show that: (1) he was "engaged in a constitutionally protected activity;" (2) the SPD officer's actions "would chill a person of ordinary firmness from continuing to engage in the protected

---

strike members of the gatherings. In both cases, we concluded that seizures occurred. *Cf. Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024) (reasoning that dispersal of a crowd with airborne chemical irritants or flashbang grenades, not projectiles, did not constitute a seizure).

activity;" and (3) "the protected activity was a substantial or motivating factor" in the SPD officer's conduct. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

Whether an officer was motivated by discriminatory animus "involves questions of fact that normally should be left for trial," *id.*, but here, Cheairs fails to present a triable issue with respect to the third element of his retaliation claim. Cheairs testified in his deposition that he had no reason to believe that Officer Anderson intended to hit him with a blast ball as he stood filming the protest. And in response to the summary judgment motion, he offered no evidence that Officer Anderson was aware that Cheairs was filming the protest, much less that Officer Anderson sought to retaliate against him for exercising his First Amendment rights. Indeed, the record corroborates Officer Anderson's statements that there was a line of SPD officers standing in front of him, blocking his view.

In comparison, the officer in *Sanderlin* did not deny that he intended to strike the plaintiff with a foam baton round, and he even shouted a warning that Sanderlin would be hit if he did not move. *Sanderlin*, 116 F.4th at 909. Based on these facts, we held that a factfinder "could reasonably infer that those actions were motivated by retaliatory animus." *Id.* at 911. Similarly, in *Index Newspapers*, we noted there was "exceptionally strong" evidence of retaliation where journalists wearing clothing conspicuously marked "PRESS" and "standing nowhere near protesters" were targeted with pepper spray at point-blank range, shot in the chest with less-lethal munitions, and physically assaulted while recording federal agents' conflict with protesters. *Index Newspapers*, 977 F.3d at 829. Unlike the plaintiffs in these cases, Cheairs did not meet his burden of offering

admissible evidence to show a material dispute of fact concerning the causal relationship between his protected activity and his subsequent injury. *See Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019).

We affirm the district court's order granting summary judgment with respect to Cheairs's First Amendment claim.

## D

Local government units may be held responsible under Section 1983 when they maintain a policy or custom that causes the constitutional violation at issue. *Monell*, 436 U.S. at 690, 694. But without a constitutional claim that can survive summary judgment, the district court correctly ruled that Cheairs cannot establish *Monell* liability. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015).

We **AFFIRM** the judgment of the district court.